SAMPSON et al. v. CAMPERDOWN COTTON MILLS.

(Circuit Court, D. South Carolina.   October 19, 1897.)

1. CORPORATIONS—ULTRA VIRES—CONTRACTS FOR FUTURE DELIVERY.
   The fact that a cotton-mill corporation purchases cotton for future delivery, through a broker, and puts up margins necessary to carry it, does not render the purchases ultra vires, if they were not in fact speculations on the rise and fall of cotton, but were made in the ordinary and legitimate business of the mill for its own use.

2. CONTRACTS FOR FUTURE DELIVERY—VALIDITY.
   Where such contracts are not illegal in their origin, the carrying of them, and paying from time to time the margins on them, are not invalid if their purpose is to save the corporation from loss.

3. SAME—TEST OF VALIDITY.
   The true test of the validity of a contract for future delivery is whether it could be settled only in money, and in no other way, or whether the party selling could tender and compel the acceptance of the particular commodity sold, or the party buying could compel the delivery of the commodity purchased.

4. SAME—INTENT OF PARTIES.
   Under Acts Assem. S. C. 1883 (18 St. at Large, p. 454), relating to contracts for sales for future delivery, validity depends upon the bona fide intent of the parties.

5. SAME—BURDEN OF PROOF.
   The burden of showing that a contract of sale for future delivery, which expressly gives the right to the seller to deliver and to the buyer to demand the delivery of the article sold, is invalid, is on the party attacking its validity.

6. SAME—ADVANCES BY THIRD PARTY—MARGINS.
   Though a third party advancing money to pay losses on an invalid contract of purchase for future delivery might, under some circumstances, be so connected with the immorality of the contract as to be affected by it, yet where he had no knowledge of the inception of or early payments on the transaction, which was on its face regular and valid, and carried on in good faith, and his advances were made to prevent loss, and after the whole risk had been incurred, it would not be equitable to hold him responsible.

7. SAME—VALIDITY OF MORTGAGE.
   In such a case a mortgage given to the third party by the purchaser, a corporation, to secure his advances, would be binding.

Cothran, Wells, Ansel & Cothran, for complainants.
Haynsworth & Parker, for defendant.

SIMONTON, Circuit Judge.   This case comes up on an original and a cross bill.   The original bill is filed to foreclose a mortgage given by the Camperdown Mills to secure past and future advances.   Pending this main cause, Julius C. Smith and other stockholders filed their petition for leave to intervene in the cause, and to be made parties hereto. Leave having been granted, they came in, and, filing their answers, filed also their cross bill.   The cross bill charges that certain items of indebtedness to the complainants, as shown in their account, were incurred by the officers of the corporation without lawful authority, in fact and in law, and are not binding on the corporation; certainly not on those stockholders who did not authorize or participate in the unauthorized and illegal acts.

The main facts are these:   The Camperdown Mills is a corporation of the state of South Carolina, engaged in the manufacture and sale of

cotton goods. In the year 1887, during the presidency of Mr. Hammett, he bought for the mill 2,700 bales of cotton for future delivery. Closing out this transaction, the mills made a profit. In 1890, President Hammett made another purchase of 1,500 bales of cotton for future delivery, and in 1891 Mr. Beattie, president, under the instruction of the board of directors, made another purchase of 1,500 bales of cotton for future delivery. O. H. Sampson & Co., having their offices in New York and Boston, were the commercial agents of the Camperdown Mills, aiding them by advances towards their commercial capital, and receiving and selling all the output of the mill, having a lien on all goods in their hands for securing the balance of account. When these purchases for future delivery of cotton were made, the transaction was through Woodward & Stillman, of New York, brokers, the money for margins being put up by the Camperdown Mills, at first directly, and afterwards by drafts upon or instructions to the commercial agents, O. H. Sampson & Co. After the transactions were made, but before they were closed out, Charles E. Sampson, a member of the firm of O. H. Sampson & Co., was made president of the Camperdown Mills, and thenceforward he managed the contracts for future delivery made by his predecessors. The course of the cotton market was such that it was deemed most advisable to carry, and not to close out, these contracts, under the delusive hope that a change for the better would occur. While this was done, Sampson & Co. continued to make all the advances necessary to carrying the cotton, and Mr. Charles E. Sampson, the president, at one time, in order to avoid the anticipated result of the Hatch bill, forbidding such contracts, transferred all the contracts from the New York Cotton Exchange, where they originated, to the Liverpool Cotton Exchange. Finally the evil moment came. The transactions were closed out at a loss of $87,551.41. This constitutes the chief part of the account of complainants, as most of the money to meet the losses was paid by them as the commercial agents of the mill. The manufacturing business proper of the mill was successful. Each year but the last there was a profit made. In the reports to the stockholders this profit appeared. The money paid out on the future contracts did not appear in the profit and loss account. This money was carried as money paid to the brokers, not precisely as an asset, but certainly not treated as a loss, until the end, when the account was closed, and the loss realized. The directors of the company were cognizant of and approved these transactions, and at a meeting of stockholders a majority approved them also. O. H. Sampson & Co. were large stockholders, having, through their own stock and that of their friends, a controlling voice in the corporation. O. H. Sampson, the head of the firm, was at one time vice president. He was also a director. Charles E. Sampson, another member of the firm, as president, as we have seen, succeeded Mr. Beattie, who had succeeded Col. Hammett. There were several other members of the firm of O. H. Sampson & Co. These had no other connection with the Camperdown Mills, save as commercial agents, and also having an interest in the stock standing in the name of O. H. Sampson & Co. The minority stockholders, complainants in the cross bill, contend that these transactions in futures were purely

speculative in their character; that so they were ultra vires, and also in contravention of the express law of the state of South Carolina, whose creature this corporation was; that O. H. Sampson & Co., by reason of the close connection of two of the members of their firm with the direction and control of the company, and by reason of the fact that they were stockholders, had full notice of the illegality of the transactions; that they advanced all the money which they did advance with this notice; that they are affected by it, and cannot now recover it back.

The first question to be discussed in reaching a conclusion of this most difficult and interesting case is, what was the character of these transactions? Were they entered into as speculations on the rise and fall of cotton, or were they made in the ordinary and legitimate business of the mill,—purchases of cotton for the use of the mill? The answer to this question involves an inquiry into the motive which induced the purchases in the first instance. What was the purpose of Mr. Hammett and of Mr. Beattie in making the purchases of cotton on the New York Exchange, and why did Mr. O. H. Sampson advise and approve them? It is a difficult thing, generally, to get at the motive for an act. Usually we try to ascertain the motive by the declarations and conduct of the parties, and by the circumstances which surround them. In deducing the motive in this way, much depends upon the personal integrity and character of the parties. In the present case we are dealing with men of the highest business character for integrity and honesty. No fraud or bad motive is charged against any of them. No room exists for such a charge. Personally none of them had any private interest to subserve. Except as the transactions affected the interests of the corporation of which they were officers and stockholders, none of them had a dollar's interest in the matter. As far as the firm of O. H. Sampson & Co. was concerned, they made none of the contracts, had no interest in any one of them, and furnished the money needed in carrying the contracts precisely in the same way as they made any other advance to the corporation. There is a letter in the record which gives a clue to the intent with which Col. Hammett went into these operations in futures. He inaugurated the practice, and we can safely presume that it was continued by his successors and colleagues for the same reasons which actuated him. The letter is as follows:

"Greenville, S. C., November 26, 1887.

"Messrs. O. H. Sampson & Co., Boston, Mass.—Gentlemen: In a recent letter from you in reply to one of mine, in which I had reported that we had purchased all the cotton we should need at Piedmont, you expressed a regret that we could not say the same thing for Camperdown. There are several reasons why I did not do the same thing for Camperdown. One was that we had no place to store it until our new warehouse was completed, which has now been done; but the principal reason was that we did not have the money to pay for it, and had to run along as best we could from hand to mouth. On the 25th of October I became uneasy, and thought it very probable that the price would advance materially, and before we could buy a supply; and, in order to protect ourselves against such, I bought some contracts in New York. I bought 300 bales for each of the nine months beginning with January and ending with September, as follows: [Bales set out in detail, the aggregate being 2,700 bales.] The same afternoon of the day I bought these contracts they ad-

vanced 8 points, and in less than three weeks they had advanced one cent per pound, which is $5 per bale, and upon these contracts $13.500 profit, less the expenses, which will be about $700. It declined somewhat after that, but yesterday it was advanced to nearly the same price, and we could sell to-day. I presume, at. $12,000 profit. This was, of course, a great temptation to realize the profit, but I did not buy for that purpose. My plan is this: As we buy the spot cotton to sell the months against these contracts,' so as to reduce the cost to us. If cotton advances here, and we have to pay a high price for spot cotton, when we sell the contract we get a higher price in New York, so that the advantage to us is that the price is fixed, and will not cost us here more than 9 to 9¼ cents for the average through the season for the 300 bales per month. Our consumption is about 375 bales per month, and I now regret that I did not buy 400 instead of 300 per month. I think I have talked to you about this plan of running a mill before, and that you heartily approved of my suggestion. It means this, and nothing more: That we fix the price for our cotton before we pay for it, and know just what we are doing. Our goods are usually sold largely ahead, and, if we make the sales without the cotton to produce them, it is the worst kind of dealing in futures; but when we protect ourselves by buying futures of cotton, we fix the price for it to make the goods already sold, which is perfectly legitimate and proper. At any time when futures are low, it is the best way to run a mill, because it saves you a large amount of interest and insurance and loss in weight, which necessarily attaches to the purchase of spot cotton. I thought you would be gratified to know this, and I really feel very glad to be able to make such a report. So far as the 300 bales per month is concerned, it does not matter to us whether the price goes to 15 cents or to 5 cents. It is fixed to us at 9 to 9¼ cents.

"H. P. Hammett,
"President Camperdown Cotton Mills."

It clearly appears from this letter that the purpose of purchasing cotton deliverable in the future was to advance the business of the Camperdown Mills in the course of that business, and it was deemed a wise—perhaps necessary—precaution in the business; that they were not entered into as a speculation, or for the purposes of speculation. The question is not whether the course suggested was wise or unwise, prudent or rash. Was it business, or was it speculation? Is it a part of the method of conducting a manufacturing enterprise and the disposing of its product? If it is, then the bare fact that contracts were made for the future delivery of cotton does not show that the contracts were ultra vires and void. If the origin of these contracts was not illegal, then the carrying of them, and paying from time to time the margins on them, were not invalid, if their purpose was to save the corporation from loss.

It is said, however, that such contracts are illegal per se. The contracts in the case at bar were made according to the rules of the New York Exchange, and afterwards according to the rules of the Liverpool Cotton Exchange. The general law does not forbid contracts for the future delivery of any kind of personal property. Nor is the contract made illegal if one or the other settles the contract by the payment or receipt of money. The true test of the validity of the contract is whether it could be settled only in money, and in no other way; or whether the party selling could tender, and compel the acceptance of, the particular commodity sold; or whether the party buying could compel the delivery of the commodity purchased. Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950. Under the rules of the New York Cotton Exchange, all sales or purchases for the future delivery of cotton contain an express provision that there must be an actual delivery of cot-

ton if this be required. For this reason the validity of these contracts has been sustained by the courts of New York. This being the general law, is there anything in the law of South Carolina which conflicts with it? It may be assumed, for the purpose of this discussion, that such a law in South Carolina would enter into and be a part of the charter of the Camperdown Mills, a South Carolina corporation. The legislation of this state is found in Acts Assem. 1883 (18 St. at Large, p. 454), "An act to declare unlawful contracts for the sale of articles for future delivery made under certain circumstances, and to provide a remedy in such cases." This act makes unlawful "every contract, bargain or agreement, whether verbal or in writing, for the sale or transfer at any future time * * * of any cotton, grain, meats or any other animal, mineral or vegetable product of any and every kind unless the party contracting, bargaining or agreeing to sell or transfer the same is at the time of making such contract, bargain or agreement the owner or the assignee thereof, or his duly authorized agent to make or enter into such contract, bargain or agreement for the sale or transfer of such * * * cotton, grain, meats or other animal, mineral or vegetable product so contracted for, or unless it is the bona fide intention of both parties to the said contract, bargain or agreement at the time of making the same that the said * * * cotton, grain, meats or other animal, mineral or vegetable product so agreed to be sold and transferred shall be actually delivered in kind by the party contracting to sell and deliver the same and shall be actually received in kind by the party contracting to receive the same at the period in the future mentioned and specified in said contract, bargain or agreement for the transfer and delivery of the same." The regulations of the New York Cotton Exchange are not in conflict with this act. All depends upon the bona fide intent of the parties; and, as the words of the contract expressly give the right to the seller to deliver, and to the buyer to demand the delivery of, the article sold, this expresses that intent. The burden of showing that a contract like this, valid on its face, is invalid, is on the complainants in the cross bill. Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160. The record in this case discloses no direct evidence on this point.

There is yet another view to take of this case. The contracts in question were made by the Camperdown Mills, through its own brokers in New York. O. H. Sampson & Co. were connected with them only in lending to the Camperdown Mills the money used for margins. This money was advanced in the performance of their duties as commercial agents of the corporation. It inured for the benefit of the corporation alone. Sampson & Co. had no interest in the contracts at all. During the whole currency of the contracts the corporation had the opportunity of profit, and by advances made by Sampson & Co. the corporation had all the chances of protection from loss. They enjoyed all the opportunities for profit. When the loss was realized, the controlling officer of the corporation, with the approval of a meeting of stockholders, executed this mortgage. Suppose that the contracts made through Woodward & Stillman, the New York brokers, and Weld & Co., the other brokers, were tainted with illegality; this

mortgage, made after the transaction to secure moneys advanced to pay the losses, is binding. "An express promise to pay money advanced to satisfy an illegal claim will sustain an action." Armstrong v. Toler, 11 Wheat. 258. When losses have been made in an illegal transaction, a person who lends money to the loser with which to pay the debt can recover the loan, notwithstanding his knowledge of the fact that the money was to be so used. Armstrong v. Bank, 133 U. S. 469, 10 Sup. Ct. 450, quoting many cases. This is also the law of England. Warren v. Billings, Law J. 55. The language of the supreme court in Roundtree v. Smith, 108 U. S., at page 276, 2 Sup. Ct. 630, applies to this case. There the brokers who were employed by Roundtree to make contracts like those in this case sued for the money paid by them on the margins for Roundtree and for their services, and recovered judgments. The case went up. In the opinion of the court, delivered by Mr. Justice Miller, he says:

"It is to be observed that the plaintiffs in this case are not suing on these contracts, but for services performed and money advanced for defendant at his request. And, though it is possible they might, under some circumstances, be so connected with the immorality of the contract as to be affected by it, if proved, they are certainly not in the same position as a party sued for the enforcement of the original agreement."

There is still another view to be taken of this case. It is pressed by counsel for complainants, and, although its presentation is not necessary to the decision of the case, it may prove conclusive. Mr. Hammett's purchase of 1,500 bales of cotton in 1890 was made upon his own judgment, and not under the advice of O. H. Sampson & Co. Mr. Hammett, as president of the Camperdown Mills, himself sent on to the New York brokers, Woodward & Stillman, the money necessary to inaugurate the transaction, and from time to time he sent on the money necessary to keep up his margins. After a time he began to draw on O. H. Sampson & Co. to furnish the money, and thenceforward they carried the cotton. The record does not disclose any knowledge on their part of the inception of, and the early payments upon, this transaction. It is to be presumed that when they began paying the drafts they had notice, or were put on notice. It would require an extreme view of this matter to hold them particeps criminis in this act of Mr. Hammett, and so work a forfeiture of all the sums paid out by them upon his order. The purchase had been made by Mr. Hammett in accordance with his views of the best interests of the manufacturing business of the mills. It may have been an error, may have been unbusiness-like, may have set a dangerous precedent; yet he was selected as president because of his business character and experience, and among the powers belonging to him was that of purchasing material for manufacture. It would not be equitable or in accordance with law to hold them responsible for the supposed error or blunder or conduct of Mr. Hammett. When they began to pay out money on the contract, the whole risk had been incurred, and what they did was done to save loss, if possible. This being so, the account may be stated so as to take out all items of money advanced upon contracts entered into with the full knowledge and approval of O. H. Sampson & Co.:

Aggregate of account of O. H. Sampson with Camperdown Mills se-
cured by mortgage...........................................  $92,021 25
Total loss in futures..............................  $87,551 41
Deduct loss on the transaction of 1890................   34,470 21
                                                      ——————   53,081 21
                                                               ———————
Balance .........................................................  $38,940 04
Credit proceeds of yarn on hand, sold by O. H. Sampson & Co......   26,101 88
                                                               ———————
Balance due on mortgage debt.............................  $12,828 16
Proceeds of sale had on foreclosure made in this case.............    9,050 00
                                                               ———————
Balance unpaid .......................................... $ 3,778 16

So, charging off losses on futures with which O. H. Sampson & Co.
were participants, their debt is not yet paid out of the proceeds of the
mortgage sale.

The account by complainants in the original bill is made up with
monthly rests.   This is not correct.   Simple interest alone can be al-
lowed, and, on both sides of the account, charges and credits.   The
cause will be recommitted to the special master to restate the account
in accordance with this opinion.   Let the cross bill be dismissed.