WILLOUGHBY W. SHARP et al.

*v.*

JOHN STALKER et ux.

[Filed September 6th, 1902.]

1. In a suit to subject to a judgment land conveyed by the judgment debtor to his wife, she, not having been a party to the action in which the judgment was rendered, may make the defence that the judgment was founded on a gaming transaction.

2. In determining whether transactions in stocks are lawful or merely gaming transactions, that the transactions between the broker and those of whom he bought or to whom he sold are real, is not decisive, but the question is whether, as between broker and customer, the dealings are really dealings in differences.

*Mr. Alan H. Strong,* for the complainants.

*Mr. Willard P. Voorhees,* for the defendants.

STEVENS, V. C.

This is a suit brought to set aside a fraudulent conveyance made by John Stalker to his wife. On July 26th, 1894, the complainants recovered judgment against the defendant John Stalker for $2,071.64. The judgment is based upon two promissory notes, for $1,000 each, made by Stalker to complainants, dated November 1st, 1893. On November 3d of that year Stalker conveyed certain real estate in New Brunswick to Charles B. Herbert, and on November 4th, 1893, Herbert conveyed it to Margaret I. Stalker, wife of John Stalker. In each deed the consideration is stated to be $1. Without discussing the evidence, I may say that I think it shows that the conveyances were fraudulent as against the complainants, and that complainants could avoid them if they held a judgment enforceable as against Mrs. Stalker. In the words of the court of appeals, in *Minzesheimer* v. *Doolittle, 15 Dick. Ch. Rep. 397,* although the judg-

ment fixes, as against all the world, the *status* of the plaintiffs as judgment creditors of the defendant, it does not prevent defendant's wife, who was not a party thereto, and who has had, for the first time in this cause, an opportunity to raise the defence, from showing the real character of the debt. It is contended by Mrs. Stalker that the debt arose out of a stock gambling transaction; that the facts are substantially the same as those proved in *Minzesheimer* v. *Doolittle,* and that relief must be refused complainants on the grounds there indicated. I think that this contention is correct.

It appears from the correspondence that, on July 2d, 1888, an account, for purposes of speculation, was opened by Stalker with the firm of W. H. Calhoun & Company, who were stock brokers in New York City, and that $1,000 were deposited with them as a margin. This firm, of which the complainant Sharp was a member, dealt with Stalker until July, 1891, when it was succeeded by the present firm of Sharp & Bryan. The account with the latter was continued until the close of the year 1893 or the early part of 1894. During all this time stocks were bought and sold for the account of Stalker. The purchases were at times very large—far beyond the ability of Stalker to pay. In September, 1891 (the month in which the purchases were the largest), they amounted to over $600,000. The money to buy was, in every case, supplied by the brokers. During the five years of their dealings nothing was ever called for but a margin. The contention of counsel for complainants is that, inasmuch as the evidence does not show affirmatively that there were to be no deliveries as between broker and customer, the transaction was not proved to be a dealing in differences, and therefore a gambling transaction.

In order to test the soundness of this contention, I will state the legal effect of the transaction as I understand it. It is beyond question that, as between the brokers and those of whom they bought or to whom they sold, the purchases and sales were *real* purchases and sales. When the transaction was a "long" transaction, the stocks were bought and paid for by the brokers out of their own moneys and there was an actual delivery of

the stock certificates. When the transaction was a "short" one, although the brokers did not have the stock when they sold it, they would be able to borrow it, and so make an actual delivery at the time stipulated. They received the price of the stock so sold, and they, presumably, used the money received in the purchase of other stock, sufficient to replace that borrowed. I say, therefore, that as between the brokers and those with whom they dealt, the transactions were real transactions, and not dealings in differences. And if the complainants stood simply in the position of agents of Stalker, buying and selling only on his behalf, the transaction could not be regarded as unlawful. This was the view taken of it by the English courts, in *Thacker* v. *Hardy, 4 Q. B. Div. 685,* and is the view held by the New York courts. It is not the view taken by our court of appeals. *Flagg* v. *Baldwin, 11 Stew. Eq. 219,* is the leading case. It is there held that where a broker is, ostensibly, engaged in buying and selling stock for a customer, he is not necessarily the agent of that customer. He may stand towards him in the character of principal, and therefore the mere fact that the transactions, as between the broker and those of whom he buys stocks, or to whom he sells stocks, are real transactions, is not decisive. To determine the true character of the transaction, as between broker and customer, we must look elsewhere. As between them, are they merely dealing in differences, or are they purchases and sales really made on behalf of the customer? There are, obviously, two guides to the determination of this matter—*first,* the agreement between the parties made at the beginning of the transaction, and *second,* their subsequent correspondence and acts. Our court of last resort holds that the ostensible agreement of the parties, even when reduced to writing, is not necessarily controlling, because it may be a mere cover. Hence it follows that, in cases of this character, the acts and correspondence of the parties are of more importance than their formal declarations. If from these acts and that correspondence it is seen that the transaction is, in reality, a dealing in differences, then the name or color given to it is of no consequence. If it be shown that the customer has furnished the broker with the money to buy

the stock, and that the stock has been actually delivered to the customer, then it would appear that the transaction was not a gambling transaction. In such a case the broker has acted simply as agent. But if, on the other hand, it be proved that the broker has furnished the money and taken the stock certificate in his own name; that he has subsequently sold, with or without communication with the customer, to whom he announced the purchase and sale, and that the customer has only put up a margin to protect the broker against a possible fall in price, then it would at least be doubtful whether, as between broker and customer, the transaction was anything more than a dealing in differences. If, in a great multitude of instances, extending through a considerable period of time, the transaction had always been of this character, and if the only remittances ever made by the broker to his customer had been profits derived from sales, where the transaction had been a "long" one, and from purchases, where it had been a "short" one, and if the only remittances made by the customer to the broker had been remittances to keep up the margin, then the only reasonable inference that could be made from this mode of dealing would be that the parties were really dealing in differences; and this being so, it would be reasonable to conclude that they, as intelligent men, intended to do what, in point of fact, they did. Now, if it were proved that, on one occasion out of a multitude of instances covering a long period of time, the customer had received from the broker a single certificate of stock, which he had actually paid for, it would seem to me that this proved, not that all the other transactions were not dealings in differences, but that, on this one occasion, the broker and his customer had deviated from their usual course of dealing, and had taken another course.

In this exposition of the matter, I may seem, in the words of Disraeli, "to be illustrating the obvious and explaining the evident." What I have been saying has, however, a direct bearing upon the case at bar. No written agreement was made, no explicit verbal agreement is shown. The beginning of the transaction is to be found in the letter of July 2d, 1888, in which Calhoun & Company write to Stalker, as follows:

"DEAR SIR.—In accordance with your understanding with Mr. Sharp we have this day transferred your account to his firm, Messrs. W. H. Calhoun & Co., giving them $1,000 received from you."

The understanding referred to was that Stalker had $1,000; that he came to speculate with it, and that Sharp would receive his account; that "the margin had to be kept up," and that, failing that, the stocks would be put upon the market and sold. The agreement of the parties, beyond this general understanding, can only be inferred from their acts, from the accounts rendered and from the correspondence; and these all indicate a' dealing in differences. Indeed Mr. Sharp himself so testifies. This is his evidence:

"*Q.* Did you ever have any stocks registered in Mr. Stalker's name?

"*A.* They were never paid for outright, so that they were never registered in his name.

"*Q.* So that all his dealings with you were limited to a settlement of differences arising out of the fluctuation in the prices of the stock dealt in?

"*A.* Well it might or might not have been at all times. He may have had money enough to pay for some outright, and, on second thoughts, I think he did.

"*Q.* But what I have just stated is the general character of the transactions?

"*A.* Yes, sir; I suppose so.

"*Q.* (By the Court.)—He didn't invest his money in stock?

"*A.* No sir."

Mr. Stalker says that he never, except on one occasion, paid for any stock, and that, with this exception, no certificates were ever delivered to him. There is attempt to contradict this statement. Counsel argues that because in this one instance it is shown that Mr. Stalker took the stock, the court ought to infer that it was the agreement that all the stock should be taken, and if it was not taken at other times, it is to be inferred that it was not, not because he was not under a legal obligation to take it, but because, by mutual consent, it was left with Mr. Sharp. This one instances proves, he says, that it was not the agreement that there should be no deliveries. But, he contends, if it be not shown affirmatively that there were to be no deliveries, then it is not proved that the agreement is illegal. To sustain this view he relies upon *Pratt* v. *Boody, 10 Dick. Ch. Rep. 175;*

*S. C., 11 Dick. Ch. Rep. 429.* There the customer sometimes took and paid for the stock purchased and sometimes left it in the broker's hands. It was held that the transaction was not shown to be illegal.

The distinction between that case and this is obvious. If the customer orders the broker to buy two stocks and gives him enough money to pay for one, and the broker buys both, no reasonable inference can be made that the entire transaction, or any part of it, is a dealing in differences. It might just as reasonably, or more reasonably, be inferred that the broker had made a *bona fide* advance of money to his principal. The character of the transaction being in doubt, the law would not assume it to be unlawful; for the presumption is always in favor of its legality, when capable of a construction that would make it lawful. And if, in the course of a great number of purchases by the broker for the account of his customer, it appears that the customer sometimes pays for and takes the stock and sometimes leaves it in the broker's hands, until the broker sells it, the transaction is still capable of a twofold construction, and the presumption of law in its favor still obtains. This I understand to be the *rationale* of the decision of *Pratt* v. *Boody.* But the inference to be made in this class of cases is not an artificial one. It is such an inference as a reasonable man would make from all the facts. If the purchases and sales are very numerous, and they have occurred through a long period of time, and all, with a single exception, point in one direction, it seems to me that the only reasonable inference that can be made is that the parties have been dealing in differences; and that they intended to deal in differences, except in the one case in which they, for some special reason, agreed otherwise. If this be so, the case in hand comes within the decision in *Minzesheimer* v. *Doolittle,* and not within the decision in *Pratt* v. *Boody.* I think there should be a decree for the defendants.