BENSON-STABECK CO., APPELLANT, *v.* RESERVATION
FARMERS' GRAIN CO., ET AL., RESPONDENTS.

(No. 4,576.)

(Submitted January 4, 1922.  Decided January 31, 1922.)

[205 Pac. 651.]

*Promissory Notes—Grain Contracts—Future Delivery—Gaming*
*—Presumptions—Burden of Proof—Intent—Evidence.*

Grain Contracts — Future Delivery — When Valid — When Invalid as
Gaming—Intent of Parties.

1.  In the absence of statutory regulation to the contrary, a con-
tract for the sale of goods to be delivered at a future day is
valid, even though the seller may not have them at the time, pro-
vided the parties intend and agree that they are to be delivered
and paid for; where, however, under the guise of such a contract
the real intent of both parties is to speculate in the rise and fall
of prices, and the goods are not to be delivered but that instead
of delivery there shall be a mere payment of the difference be-
tween the contract price and the market price at the date fixed for
executing the contract, the transaction is a wager and void.

Same—Future Delivery—Gaming—Presumptions—Burden of Proof.

2.  Grain contracts for future delivery are presumed to be lawful,
and the burden of proof is upon the party assailing such a trans-
action on the ground that it is a wagering contract, to show an in-
tention by both parties to it to settle by payment of the market
differences.

Same—Intent of Parties—Evidence—Declarations.

3.  To establish an intent in the buyer and seller of grain for
future delivery that settlement shall be made by payment of the
differences in the market price, it is not indispensable that declara-
tions and statements by them showing such intention be proven,
their acts and facts and circumstances incident to the transaction
tending to prove such intention being sufficient.

Same—Promissory Notes—Gaming—Intent—Evidence—Sufficiency.

4.  In an action to recover on promissory notes given by a farm-
ers' grain elevator company to a grain commission merchant doing
business at Minneapolis and Duluth, evidence *held* sufficient to
warrant the trial court in submitting the question to the jury
whether the notes were given by defendants and received by
plaintiff with intent in both parties to cover transactions in the
grain market under which payment should be made by settlement
between the contract price and the market price.

Same—Gaming—"Margin" Transactions—Evidence on Question of In-
tent.

5.  While the fact that all dealings between the parties claimed to
be illegal were "margin" transactions was not alone sufficient to
stamp them as wagering contracts, such fact may be considered by
the jury, in connection with other competent testimony to show an
illegal contract, in determining the intention of the parties.

*Appeals from District Court, Missoula County; Theodore Lentz, Judge.*

ACTION by the Benson-Stabeck Company against the Reservation Farmers' Grain Company and others. From a judgment for defendant and an order denying a new trial, plaintiff appeals. Affirmed.

*Messrs. Mulroney & Mulroney, Mr. A. N. Whitlock* and *Mr. O. W. Belden,* for Appellant, submitted a brief; *Mr. Whitlock* argued the cause orally.

The supreme court of the United States recognizes the usefulness of such exchanges as the Minneapolis chamber of commerce in the case of *Nicol* v. *Ames,* 173 U. S. 509, 43 L. Ed. at page 792, 19 Sup. Ct. Rep. 522 [see, also, Rose's U. S. Notes], as shown by the following language: "It is common knowledge that these exchanges encourage and promote honest and fair dealing among their members; that they provide penalties for the violation of their rules in that regard, and that contracts between members relating to business on the exchange have the advantage of the sanction provided by the exchange for such purposes."

The case of *Ponder* v. *Jerome Hill Cotton Co.,* 100 Fed. 373, 40 C. C. A. 416, was an action on a note for losses paid by the defendant's brokers on contracts for future delivery of cotton, which were sold before the time for delivery arrived. The court recognizes fully the legality of buying and selling for future delivery and the purchase and sale of such contracts after they are made. The court held that an intention to sell the contract before it was due in no way affected its validity.

In *Clews* v. *Jamieson,* 182 U. S. 461, 45 L. Ed. 1183, at 1196, 21 Sup. Ct. Rep. 845, the court points out that the burden is upon the party asserting the illegality to show an intention by both parties to settle by a payment of market difference. The court says: "In order to invalidate a contract as a

wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price. (*Pearce* v. *Rice,* 142 U. S. 28, 35 L. Ed. 925, 12 Sup. Ct. Rep. 130, [see, also, Rose's U. S. Notes]; *Pickering* v. *Cease,* 79 Ill. 328.'' See, also, *Cleage* v. *Laidley,* 149 Fed. 346, 79 C. C. A. 284; *Bibb* v. *Allen,* 148 U. S. 481, 37 L. Ed. 819, 13 Sup. Ct. Rep. 950; *Chicago Board of Trade* v. *Christie,* 198 U. S. 236, 49 L. Ed. 1031, 25 Sup. Ct. Rep. 637 [see, also, Rose's U. S. Notes]; *Hallet* v. *Aggergaard,* 21 S. D. 554, 14 L. R. A. (n. s.) 1251, 114 N. W. 696; *Springs* v. *James,* 137 App. Div. 110, 121 N. Y. Supp. 1054.)

It is clear from all the authorities that the intention to speculate does not affect the validity of the transaction. (*In re Taylor & Co.'s Estate,* 192 Pa. St. 304, 73 Am. St. Rep. 812, 43 Atl. 973; *Bailey* v. *Phillips,* 159 Fed. 537.) Judge Cooley in an early Michigan case—*Gregory* v. *Wendell,* 40 Mich. 432— says: ''If the parties contemplated an actual purchase of corn and acted in good faith in making such purchase, the fact that speculation was the object was of no legal importance whatever.'' The foregoing authorities establish that the necessary intention must exist in the minds of both parties. (See, also, *McCarthy* v. *Weare Commission Co.,* 87 Minn. 11, 91 N. W. 33; *Hocomb* v. *Kempner,* 214 Ill. 458, 73 N. E. 740; *Boyd* v. *Hanson,* 41 Fed. 174; *Donovan* v. *Daiber,* 124 Mich. 49, 82 N. W. 848.)

The intention required must be one to settle on market differences. An intention to speculate and to close out the contracts before maturity is all right as the foregoing authorities show. It must appear that both parties intended that no actual purchases should be made at all. Here it is admitted that in every instance contracts were entered into upon the chamber to buy or sell, and these contracts were binding and delivery could be required of actual grain or of another contract offsetting it. These admissions, it seems to us, put the defendants out of court. Upon this point we call attention to

the case of *Young* v. *Glendinning,* 194 Pa. St. 550, 45 Atl. 364; *Thompson* v. *Williamson,* 67 N. J. Eq. 212, 58 Atl. 602; *Sampson* v. *Camperdown Cotton Mills,* 82 Fed. 836.

The putting up of margins is perfectly consistent with honest purpose and fair business dealing. (*Kendall* v. *Fries,* 71 N. J. L. 401, 58 Atl. 1090; *Hocker* v. *Western Union Tel. Co.,* 45 Fla. 363, 34 South. 901; *Hooper* v. *Nuckles* (Ala.), 39 South. 711; *Fisher* v. *Fisher,* 113 Ind. 474, 15 N. E. 832; *Preston* v. *Cincinnati etc. Co.,* 36 Fed. 54, 1 L. R. A. 140; *Wilhite* v. *Houston,* 200 Fed. 390, 118 C. C. A. 542; *Winward* v. *Lincoln,* 23 R. I. 476, 64 L. R. A. 160, 51 Atl. 106; *Drouilhet* v. *Pinckard* (Tex.), 42 S. W. 135, (a case where there were no deliveries); *Sawyer etc. Co.* v. *Taggart,* 77 Ky. (14 Bush) 727.)

If the contracts of sale and purchase are binding when made, there is no legal objection whatever to closing them out in advance of the time for performance. (*Board of Trade* v. *Kinsey,* 130 Fed. 507, 69 L. R. A. 59, 64 C. C. A. 669; *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 49 L. Ed. 1031, 25 Sup. Ct. Rep. 637 [see, also, Rose's U. S. Notes].)

The foregoing authorities represent, we believe, the greater weight upon the questions for which they are cited, and while there are a few jurisdictions holding that delivery by setoff constitutes an illegal transaction, as does an intention to close out before maturity, and a few states, notably Missouri, holding that an intention on the part of one party is sufficient to make the transaction a gambling one, we submit that in view of the commercial importance of the question, the foregoing decisions are the better reasoned and should be followed here.

*Messrs. Russell, Madeen & Barron, Mr. Wm. Wayne* and *Mr. John P. Sevee,* for Respondents, submitted a brief; *Mr. Chas. A. Russell* argued the cause orally.

The transactions involved herein were gambling transactions, and therefore illegal and void. (See *Mohr* v. *Miesen,* 47 Minn.

228, 49 N. W. 862; *Bolfing* v. *Schoener,* 144 Minn. 425, 175
N. W. 901; *Kassuba Commission Co.* v. *Blodgett,* 155 Wis.
529, 143 N. W. 106. 145 N. W. 177; *Sunderland & Saunders* v.
*Hibbard,* 97 Neb. 21, 149 N. W. 57; *Bartlett* v. *Slusher,* 215
Ill. 348, 74 N. E. 370; *Pratt & Co.* v. *Ashmore,* 224 Ill. 587,
79 N. E. 952; *Orthwein-Matchette Inv. Co.* v. *McFarlin,* 93
Kan. 526, 144 Pac. 842; *Stafford County Grain Co.* v. *Rock
Milling & Elevator Co.,* 94 Kan. 360, 146 Pac. 1139.)

The rule applied as the test whether the transactions are
gambling or *bona fide* purchase and sale is well stated in
*Hingston* v. *Montgomery,* 121 Mo. App. 451, 97 S. W. 202,
and approved in *Saunders* v. *Baker,* 122 Mo. App. 294, 99
S. W. 51, and cited, quoted and approved in *Medlin Milling Co.*
v. *Moffatt Com. Co.,* 218 Fed. 686; see, also, *Whitesides* v.
*Hunt,* 97 Ind. 191, 49 Am. Rep. 441; *Rumsey* v. *Berry,* 65 Me.
570; *Raymond* v. *Leavitt,* 46 Mich. 447, 41 Am. Rep. 170,
9 N. W. 525; *Bartlett* v. *Smith,* 13 Fed. 263, 4 McCrary, 388;
*Barnard* v. *Backhous,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595;
14 Am. & Eng. Ency. of Law, 38.

We cite *James* v. *Clement,* 223 Fed. 385, 138 C. C. A.
621, a recent case thoroughly considered, first reported in
*Haven & Clement* v. *James,* 172 Fed. 250, reversed and re-
manded in *James* v. *Haven & Clement,* 185 Fed. 692, 107
C. C. A. 640, and after retrial and appeal was again reversed
with practical directions to dismiss the case. The rules of
the Exchange discussed in this case are substantially the
same as those of the Chamber of Commerce, and what is said
by the court in opinion reference to substitution offset, can-
cellation and the rights of customer to enforce delivery upon
the Exchange are peculiarly applicable to the facts in this case.
The opinion also shatters the claim by plaintiff's counsel that
gambling may not be done on the Chamber of Commerce.

Where there was at the initiation of the deal or transaction
no intention on the part of the customer to either receive or
deliver the thing dealt in, and the party executing such order
knew thereof, he became a party to the wrong and the trans-

action is held by all courts without any exception to be a gambling transaction, and if such transaction entered into the consideration of an obligation or note, such note or obligation is held to be void and cannot be enforced. (*Metropolitan Nat. Bank* v. *Jansen,* 108 Fed. 572, 47 C. C. A. 497.)

Dealings in futures, when both parties intend that there should be no deliveries, but only a settlement of the differences between the contract and the market price at a time fixed for executing the contract, are nothing but wagering or gambling contracts, which àre illegal and void as being against public policy, even without the aid of the statute. (*Irwin* v. *Williar,* 110 U. S. 499, 510, 28 L. Ed. 225, 4 Sup. Ct. Rep. 160; *Clews* v. *Jamieson,* 182 U. S. 461, 45 L. Ed. 1183, 21 Sup. Ct. Rep. 845 [see, also, Rose's U. S. Notes]; *Metropolitan Nat. Bank* v. *Jansen,* 108 Fed. 572, 47 C. C. A. 497; *Cleage* v. *Laidley,* 149 Fed. 346, 79 C. C. A. 284; *Ware* v. *Pearsons,* 173 Fed. 878, 98 C. C. A. 364.)

Courts closely scrutinize contested transactions of those who deal in futures and look beyond the form of the agreement to determine whether it evidences a real purchase and sale which has been with an intention to deliver and receive the commodity and not a cover for a gambling transaction. (*Stafford County Grain Co.* v. *Rock Milling & Elevator Co.,* 94 Kan. 360, 146 Pac. 1139; *Mohr* v. *Miesen,* 47 Minn. 228, 49 N. W. 862; *Barnard* v. *Backhous,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595; *Cobb* v. *Prell,* 15 Fed. 774, 5 McCrary, 80; *Melchert* v. *American Union Tel. Co.,* 11 Fed. 193 and note, 3 McCrary, 521; *Lester* v. *Buel,* 49 Ohio St. 240, 34 Am. St. Rep. 556, 30 N. E. 821.)

MR. CHIEF COMMISSIONER STARK prepared the opinion for the court.

This is an action on a promissory note. The plaintiff is a corporation organized under the laws of the state of Minnesota, transacting business as a grain commission merchant at Minneapolis and Duluth, under a license issued by the State Rail-

road and Warehouse Commission of that state, and duly bonded as such. It is a member of the Chamber. of Commerce of Minneapolis and also of the Chamber of Commerce Clearing Association of said city, both of which organizations are corporations under the laws of the state of Minnesota.

The defendant Reservation Farmers' Grain Company (hereafter referred to as the "grain company") is a corporation under the laws of the state of Montana, with its principal place of business at Ravalli in Missoula county, organized for the purpose of buying, selling, and dealing in grain and farm products of all kinds at wholesale or retail, with authority to own and manage grain elevators and generally to transact any business incident and necessary to carrying out the purposes of its organization. The defendants Deardorf, Elliott, Grant and Price were members of its board of directors. ·

The complaint is in the usual form, and alleges that at Missoula county, on October 30, 1916, the defendant grain company made, executed and delivered to plaintiff its promissory note for the sum of $10,000, payable on demand at Minneapolis, Minnesota, bearing interest at six per cent per annum from date; that prior to its delivery the defendants Deardorf, Elliott, Grant and Price "indorsed the said note for the purpose of securing credit of the said maker with the plaintiff"; that demand for payment had been made upon and refused by all of the defendants, and prays for judgment against the defendants for the amount of the note and interest.

The defendants separately filed general demurrers to the complaint, which were overruled, and thereupon they filed separate answers, each of which raises the same issues. These answers admit the execution and delivery of the note in suit; that the same has not been paid; that the plaintiff is the owner and holder thereof, but deny that the same was executed for a valuable consideration, or that it is a valid obligation against the defendants, or either of them.

For a separate and affirmative defense to the action, it is alleged that at all the times mentioned the defendant grain

company was engaged in the business of buying and selling grain as a warehouseman and in contracting for the purchase of the same from farmers, and had, prior to the execution of the note in suit, shipped grain to the plaintiff, and desired to continue to do so, but was unable to do this unless the plaintiff would extend credit to it; that plaintiff refused to extend such credit, except upon the condition that the defendants would give to it the note in question as security therefor; that thereupon and in compliance with such demand the note was executed and delivered to the plaintiff.

It is then alleged that the indebtedness, if any, existing in favor of the plaintiff and against the grain company, to secure which said note was furnished as collateral, was created through persons acting wholly without authority of the grain company, or its board of directors, but who pretended to act in its behalf in the buying and selling of what are commonly called "options" or "futures" on the Minneapolis Board of Trade, which were purchased and sold by and through the plaintiff; that in such transactions no grain was actually handled, but that "It was contemplated and intended that such transactions between the plaintiff and the defendant grain company would be adjusted, settled, and closed according to and upon the basis of the public market quotations of prices on the Board of Trade or Exchanges upon which said grain was dealt in."

Finally, the answers set out the provisions of sections 8991 and 8992 of the General Statutes of Minnesota of 1913, which make the maintenance of a bucket-shop unlawful and impose a penalty upon the keeper or proprietor thereof. The term "bucket-shop," as used in these sections, is defined as follows: "A bucket-shop, within the meaning of this Act, is defined to be an office, store or other place wherein the proprietor * * * conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any stocks, grain, provisions, or other commodity, or personal property, wherein both parties

thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreements, trades or transactions, shall be, or may be, closed, adjusted or settled, according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange, upon which the commodities or securities referred to in said contracts, agreements, trades or transactions are dealt in, and without a *bona fide* transaction on such board of trade or exchange. * * * "

The plaintiff filed motions to strike the affirmative defenses from said answers on the ground that they were immaterial, irrelevant and redundant, and also filed general demurrers to the same, all of which motions and demurrers were overruled. Thereafter replies were filed, denying the affirmative allegations of the answers, and upon the issues so framed the case was tried to a jury, and resulted in a verdict in favor of the defendants, upon which judgment was entered against the plaintiff. The plaintiff moved for a new trial, which was overruled, and the case is now before this court upon an appeal from such judgment and order.

The testimony discloses that, during a period of time extending from the fall of 1913 to the spring of 1917, the grain company actually bought from the producers of grain in the country contiguous to its elevators approximately a quarter of a million bushels of wheat, which was shipped to the markets at Duluth and Minneapolis, for sale, and in the sale of 117,000 bushels of this wheat upon the market, the plaintiff acted as its agent in actually transacting the business. Upon the arrival of a car of wheat at Minneapolis, or Duluth, the plaintiff would see that it was correctly weighed and graded by the state authorities, pay the freight and inspection charges, sell the wheat, and from the proceeds deduct the charges against the same, including a commission of one cent per bushel as its compensation, and then render a statement designated an "account sales," and remit to the grain company the net proceeds or pass the same to its credit.

In each instance the grain company, when it consigned a car of wheat to the plaintiff for sale upon the market, would make a draft on the plaintiff for a major portion of the value of the wheat consigned, which draft would be honored by the plaintiff prior to the arrival of the shipment. Upon the money so advanced, the plaintiff charged the grain company interest for the time elapsing between the date of the payment of the draft and the date of the receipt of the proceeds of the car of wheat. These were known as "cash grain" transactions, and there were ninety-two of them between the plaintiff and the grain company during the period covered by the record.

In buying wheat the grain company was obliged in many instances to make advances to the producers prior to the actual delivery of the wheat at its elevators, and after delivery of the wheat at the elevators there were frequently considerable delays before it was actually shipped to the market. To guard against losses incident to the fluctuations of the market, the grain company followed the practice known as "hedging." Under this practice, in theory, when it bought wheat at its elevators, it would also sell, on the Minneapolis market for future delivery, a sufficient quantity to cover such purchase, so that, whether the price went up or went down, its gain on one transaction would offset its loss on the other. Upon the arrival of a car of wheat at the Minneapolis market, against which a "hedge" had been bought, it would sell the wheat and close its previous sale for future delivery by buying back an equal quantity on the Minneapolis market. One "future" transaction thus canceled the other, and the gain or loss would approximately balance the loss or gain on the actual wheat bought, shipped and sold, leaving the grain company its regular profit. All the purchases and sales of these "hedging" "options" or "futures" were negotiated for the grain company on the Minneapolis Chamber of Commerce by the plaintiff as its agent or broker.

Another class of transactions between the plaintiff and the grain company is illustrated by Defendants' Exhibit No. 208,

which, omitting the formal parts, is an "account sales" rendered by plaintiff to the grain company, and the telegrams connected with the transaction.   This exhibit is as follows:

"20 M. Bushels May Wht.

Reservation Far. Gr. Co., Ravalli, Mont.

·522

Bot

9/2 20 May wht, 153¾.............. $30,750.00

Sold

| | | |
|---|---|---|
| 8/17  8 May wht, 149⅝............... | | $11,970.00 |
| 8/18  2 May wht, 152¾............... | | 3,055.00 |
| 8/19 10 May wht, 158⅛............... | | 15,812.50 |
| Internal revenue..................... | 3.09 | |
| Commissions ......................... | 30.00 | |
| To your Cr.......................... | 54.41 | |

$30,837.50   $30,837.50

E. & O. E. Benson-Newhouse-Stabeck Co.

Minneapolis, Minn., 9—2—16.

Telegram.

A127 EXS 6          Ravalli, Mont. 1918A Sep. 2 1916.

Benson Stabeck Co. Minneapolis, Minn.   Buy to close twenty May wheat Reservation Fars. Gr. Co. 1135A.

Telegram.

B177NARA       Ravalli, Mont.  Aug. 19, 1916 1010A

Benson S. Co.  Minneapolis, Minn.  Sell ten May at market. Reservation Fars. Gr. Co.  1131 AM.

Telegram.

B106NAT 6       Ravalli, Mont.   1020A Aug. 18, 1916.

Benson S. Co.  Minneapolis, Minn.  Sell two May wheat at market.  Reservation Fars. Gr. Co.  12 KN.

Telegram.

B131NA RA    6 Ravalli, Mont.   1010 A Aug. 17, 1916

Benson S. Co. Minneapolis, Minn.  Sell eight May wheat at market.  Reservation Fars. Gr. Co., 1134 AM."

In this exhibit, the telegram following the statement shows an order to buy 20,000 bushels of May wheat on September 2, and orders the sale of a like amount which had been purchased on the seventeenth, eighteenth and nineteenth days of August preceding, so that at the date of the telegram which reads, "Buy to close twenty May wheat," there had been sold for the grain company's account 20,000 bushels of wheat, and the order of September 2 was an order to purchase 20,000 bushels to close this deal. In the parlance of the Stock Exchange, the grain company was short 20,000 bushels of May wheat (that is, it had bought 20,000 bushels of May wheat before selling the same), which was covered by the purchase of September 2, the purchase being "set off" against the previous sales, and thereby the transaction closed. This is designated as a straight "option" or "future" contract.

To illustrate another kind of transaction, we refer to Defendants' Exhibit No. 166, which is as follows:

"1 M bu May Wheat.

Reservation Farmers' Gr. Co., Ravalli, Mont. Acct Bates. 5092.

Bought

3-7 1 M May 114¾..................... 1,147.50

Sold

3-13 1 M May 109¾................... | 1,097.50

| | |
|---|---|
| Internal revenue........................ | .11 |
| Commissions (Jo. entry page 51)........ | 1.25 |
| (Bates) To your debit.................. | | 51.36 |

E. & O. E. Benson-Newhouse-Stabeck Co.  1,148.86 - 1,148.86
Minneapolis, Minn. 3—13—1916

Confirmation.

3—17—16.

Reservation Farmers' Gr. Co.,

Ravalli, Mont. Acct. Bates.

| Bought of | Quantity. | Delivery. | Article. | Price. |
|---|---|---|---|---|
| Shears a. 1021 | 1 M Bus | May | Wheat | 114¾ |

Letter.

Minneapolis, Minn., March 7, 1916.

Reservation Farm. Grain Co., Ravalli, Montana—Gentlemen: We inclose confirmation on 1 Ml Wheat bought for the account of Bates and have entered a stop loss order to sell same when the margin of 5¢ is exhausted. This is in accordance with your wire instructions.

Very truly yours,

BENSON-NEWHOUSE-STABECK COMPANY.

L. M. STABECK,

Assistant Secretary.

Telegram.

B 72 NA W 10 Received at Chamber of Commerce, Minneapolis, Minn.

Benson N S Co Minneapolis Minn Buy one May wheat stop loss five cents account Bates Reservation Farmers' Grain Co. 1020A.''

This shows an order for plaintiff to purchase 1,000 bushels of wheat on margins. The expression ''stop loss five cents'' in the last telegram indicates that in the event the price of wheat on the market should decline five cents per bushel, the plaintiff should close out this deal for the grain company, without further instructions.

There were ninety-nine separate transactions between the plaintiff and the grain company, similar to the ones disclosed in the exhibits last referred to, beginning in November, 1915, and ending in April, 1917. They are designated as ''Purchase and Sale'' contracts, and are shown in Defendants' Exhibits Nos. 151 to 252, inclusive. While these transactions differ in some respects they are alike in that each consists of an order for the purchase and sale of grain for future delivery, and a purchase and sale memorandum showing the execution of the order.

In carrying on these various items of business, *i. e.,* the advancing of money to the farmers for grain to be delivered to

its elevators at future dates, payment of interest accruing to the plaintiff for advances made upon grain prior to its arrival at the market, and the payment of commissions, margins, and other expenses connected with "hedges" and the trades in "futures" and "options," the grain company became indebted to the plaintiff in considerable sums for money which the plaintiff had advanced, so that on the thirtieth day of October, 1916, the date of the note in suit, it was owing plaintiff $11,513.44, taking all the transactions into consideration. The plaintiff was unwilling to extend a further credit to the grain company unless the note in question was given to it as security, and as a result of correspondence the note was executed, indorsed and delivered to the plaintiff on October 30, 1916.

On the books of the plaintiff, its transactions with the grain company were carried under two separate accounts, one of which, designated the "cash grain account," embraced all of the items covered by the cash grain transactions shown in Exhibits Nos. 53 to 149; and the other designated as the "option" or "future contract account," included the P. & S. transactions shown in Exhibits Nos. 151 to 252, inclusive.

It appears from the testimony that on October 24, 1916, which was six days prior to the execution of the note, this "option" or "future" account showed a loss by the grain company on that account of about $8,500. On that day the plaintiff charged the "cash grain account" with the sum of $8,500, and credited the "option" or "future contract account" with the same amount, the reason for this transfer being explained in a letter to the grain company on that date as follows: "By charging your regular account with this amount, we thereby get the interest on the money which we are forced to put up with the clearing-house on the losses which your open trades show." Between that date and the time of the commencement of suit, this account varied from time to time, so that when the action was instituted on October 30, 1917, it showed an indebtedness of $13,241.52 in favor of the plaintiff, which amount was reduced prior to the trial

to $8,433.47 by the proceeds of sales of grain made by plaintiff for the grain company.

The defense relied upon by the defendants is that the indebtedness secured by the note arose out of the ninety-nine "future" or "option" contracts or deals on the Minneapolis Chamber of Commerce, shown by Exhibits Nos. 151 to 252, which they claim were made with the contemplation and intention on the part of both plaintiff and the grain company that there should be no delivery of the wheat called for therein, but that they should be settled according to and upon the basis of the public market quotations of the Board of Trade or Exchanges upon which said wheat was dealt in, that is, a settlement on the differences, for which reason it is contended they constitute mere gambling or wagering contracts, are illegal, and no recovery can be had thereon.

To sustain this defense, the defendants introduced in evidence statements of all the transactions between the plaintiff and the grain company, also correspondence leading up to the execution of the note, as well as oral testimony in explanation of the same, and likewise produced competent oral proof tending to establish the fact that in the various "future" and "option" transactions it was not the intention of the grain company to receive or deliver the wheat called for in the different contracts, but only to make settlement thereof upon the differences between the contract price and the market price of wheat quoted on the public exchange at the dates fixed for executing the contracts.

The defendants further contend that the correspondence, statements, and conduct of the parties show, or tend to show, that the plaintiff at all times had knowledge of this intention on the part of the defendant grain company. On the other hand, the plaintiff claims, and on the trial introduced evidence tending to show, that each of the transactions in question represented an actual deal on the Minneapolis Chamber of Commerce; that the same were carried on in accordance with the rules of the Chamber of Commerce and the Chamber of

Commerce Clearing Association, all of which rules were introduced in evidence; that in each transaction it made a valid and binding contract for the sale or purchase and delivery or receipt of the wheat contracted for; that under these contracts it could have been compelled to deliver or receive the wheat; that it was its *bona fide* intention to do so; and that it did not at any time have any knowledge or notice of the fact that the grain company had any intention other than to receive and pay for the grain it contracted to buy or to deliver and accept payment for the grain it contracted to sell; or at least to make settlement of these "option" or "future" contracts in a manner sanctioned by law; that it had no intention to settle any of said transactions on the differences; and that if the grain company entertained such intention, it had no knowledge thereof.

On this appeal the plaintiff assigns several errors on the [1] part of the trial court, the first six of which may properly be disposed of by a consideration of assignment of error No. 3, *viz.*, that the court erred in overruling plaintiff's motion for a directed verdict.

"The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void." The above quotation is taken from the case of *Irwin* v. *Williar,* 110 U. S. 499, 28 L. Ed. 225, 4 Sup. Ct. Rep. 160, and the same

is quoted and approved by the United States supreme court in *Clews* v. *Jamieson,* 182 U. S. 461, 45 L. Ed. 1183, 1190, 21 Sup. Ct. Rep. 845. The same rule runs through all the cases, and there can be no doubt but that, in the absence of statutory regulation, it is the settled law. (*Cleage* v. *Laidley,* 149 Fed. 346, 79 C. C. A. 284; *Chicago Board of Trade* v. *Christie,* 198 U. S. 236, 49 L. Ed. 1031, 25 Sup. Ct. Rep. 637; *Sampson* v. *Cotton Mills·* (C. C.), 82 Fed. 833.)

In order to invalidate a contract as a wagering one, *both parties* must intend that, instead of delivery of the article, there shall be a mere payment of the difference between the contract price and the market price; that is, a settlement of the differences. (*Clews* v. *Jamieson, supra; Bailey* v. *Phillips* (C. C.), 159 Fed. 537.)

The general rule of law is that contracts for the purchase [2] and sale of grain and so forth, to be delivered in the future, are presumed to be lawful and valid, and that they will be carried out by actual delivery of the property involved, or that they will be settled in some of the ways sanctioned by law. (*Gettys* v. *Newburger* (C. C. A.), 272 Fed. 209, 216.)

The burden is upon a party assailing such a transaction on the grounds that it is a wagering contract to show an intention by both parties to settle by a payment of the market differences. (*Clews* v. *Jamieson, supra;* and all other cases.)

In its final analysis the problem of determining the validity [3] or invalidity of such a contract resolves itself into the question of the *intent* of the parties at the time the contract was made. To establish this intent, it is not indispensable. that declarations or statements of the parties showing such intention or understanding should be proven. (*Pratt* v. *Ashmore,* 224 Ill. 587, 79 N. E. 952, 953.) Such statements may be overborne by facts and circumstances. (*Carson* v. *Milwaukee Produce Co.,* 133 Wis. 85, 113 N. W. 393–395.) It is to be determined from all the facts and circumstances sur-

rounding the transaction—the acts, statements, and declarations of the parties. (*Gettys* v. *Newburger, supra.*)

[4] If, therefore, there is any substantial and competent testimony in the record upon which reasonable men might differ as to the *intention* of the plaintiff and the grain company at the time these contracts were entered into, the case was properly submitted to the jury and its verdict and the judgment entered thereon should stand.

In advance of a consideration of the evidence, it should be stated in a general way that in point of time the "cash grain," "hedging," "future," and "option" transactions are mixed and intermingled and the questioned transactions appear from time to time almost from the opening of the account until its close. The case, however, as presented here in both the brief and oral argument, assumes that the same general intent runs through all the ninety-nine transactions, the legality of which is questioned.

Keeping in mind the foregoing rules of law, we proceed to an examination of portions of the testimony bearing upon the question of the intent of the plaintiff with reference to the "future" and "option" contracts.

It is urged by plaintiff that all these contracts were made under and in accordance with the rules of the Chamber of Commerce of Minneapolis, which fact would raise a presumption of their legality. The three following transactions seem to contradict this contention. January 4, 1916, defendant grain company wired plaintiff: "Buy ten May at market on opening stop loss at two cents under advise by wire to Ravalli in code." This order was executed by plaintiff by purchase of 10M May wheat on January 5 at $1.25, which was sold by plaintiff on January 7, 1916, at $1.23, pursuant to the stop loss order, without any additional instructions from defendant. On March 1, 1916, defendant wired plaintiff: "Wired you this morning buy one May wheat dollar nine or lower additional one May wheat dollar seven open order buy five May wheat at opening stop loss five cents for account of I. L. Deardorf,"

and on March 8, 1916, defendant wired plaintiff in connection with the same transaction: "Sell stop to close five May dollar ten half Deardorf." This order was executed by plaintiff by purchase on March 2 of 5M May wheat at $1.11, and the sale on March 8 of 5M May wheat at $1.10½. At another time defendant wired plaintiff: "Buy one May wheat stop loss five cents account Bates." This order was executed by plaintiff on March 7, 1916, by purchase of 1M bushels May wheat at $1.14¾, and sale of same quantity on March 13, 1916, at $1.09¾, without any further instructions from defendant. Section 7, rule 4, of the Minneapolis Chamber of Commerce prohibits a member from "making or entering into any trade, contract or transaction in any such commodity [wheat], which such person, firm, corporation or association [member] shall contemplate or intend shall be or may be closed or terminated when the market price of such commodity shall reach a certain figure."

It is apparent that the three transactions above mentioned were in contravention of this rule. These three transactions resulted in a net loss of $410.63, which amount was charged to the grain company, and is a part of the sum claimed to be due upon the note in suit.

On December 6, 1916, plaintiff sent to the grain company a statement showing the condition of its option trades, disclosing that the grain company was "long" 1,000 bushels of December wheat, to which was attached a memorandum reading as follows: "We would like very much to have this 1 Dec. wheat taken care of for there is a possibility of delivery in case those who now have short Dec. wheat with us should buy it in, which they may do at any time."

On December 9, 1916, in reply to the foregoing, the grain company wrote to plaintiff, stating they were under the impression that this December wheat had been liquidated long ago, which letter contains this statement: "We have decided not to sell out this Dec. wheat at the present time, and, if forced upon us, you may sell same out for our account, advis-

ing us by wire, that is, if this wheat is forced on us before liquidation of hedge.''

There had been some misunderstanding between plaintiff and the grain company over this transaction on account of the fact that it had been handled partly in the Duluth office of plaintiff and partly in its Minneapolis office, and on December 12, 1916, in reply to the above letter, plaintiff wrote to the grain company in reference to the transaction, the closing paragraph of the letter reading as follows: ''We will instruct our Duluth office to transfer this 1 Dec. wheat, which you are long there into May, if they find it necessary in order to avoid delivery. We make these transfers without definite instructions, as it is very expensive to accept delivery of grain, and it does not pay to take any chances on such trades.''

December 15, 1916, plaintiff wrote to the grain company: ''You are still long one thousand Dec. wheat with us and we may have this delivered to us in cash wheat so we will have to change this over to May in the morning unless we hear from you overnight that you want the Dec. sold out. We have not hurried about changing this over as we have notified you that it should be traded over, and we have happened to have short Dec. wheat for another customer so that the clearing house could not deliver to us but today he bought in his short wheat and this now leaves us liable to delivery of the cash wheat.''

And again on December 19, 1916, in reference to the same transaction, the plaintiff wrote to the grain company: ''We saw an opportunity this morning to change over your 1 Long Dec. wheat to May at 2¢ difference, which is full market at present. We scalped a 1¢ on the May end of it, thus getting 1¾¢ difference.''

The word ''scalped,'' as used in the letter last quoted, seems to have a special meaning in connection with transactions in ''options'' or ''futures.'' In *McCormick* v. *Nichols,* 19 Ill. App. 334, 336, a question similar to the one here was at issue. A witness had testified that his understanding of the word

"scalp" in such connection was "a trade for the day, and sold out that evening or the next day; it is a short trade." Whereupon the following question was asked: "Q. Does that mean or intend the delivery of grain, or a settlement on differences?" and the following answer given: "A. It is a settlement on differences." Another witness, on the same subject, testified: "I have been in the grain business ten or twelve years. As I understand it, a scalp is where we buy in the morning and close it out that night; it is a short deal, a quick sale and a settlement on differences. * * * A short deal is what I call a scalp." The court comments on the fact that no attempt was made to show a different understanding of the term "scalp," though several members of the Board of Trade were present and testified. This was held sufficient to send the case to the jury on the question of whether the contract in controversy was a gambling transaction or not.

All of the questioned dealings between the parties were [5] "margin" transactions. This fact, standing alone, is not sufficient, under the authorities, to stamp them as wagering contracts. It is true, however, that such fact may be considered, in connection with other competent testimony tending to show an illegal contract, in determining the intention of the parties. (*Jamieson* v. *Wallace*, 167 Ill. 388, 59 Am. St. Rep. 302, 47 N. E. 762; *Sharp* v. *Stalker*, 63 N. J. Eq. 596, 52 Atl. 1120; *Phelps* v. *Holderness*, 56 Ark. 300, 19 S. W. 921; *Sprague* v. *Warren*, 26 Neb. 326, 3 A. L. R. 679, 41 N. W. 1113.)

Taking into consideration the fact that at least three of the transactions were in violation of the rules of the Minneapolis Chamber of Commerce; that in the correspondence above quoted the plaintiff was endeavoring to avoid acceptance of delivery of wheat, at a time when delivery was imminent, saying that it was "expensive, and it does not pay to take any chances on such trades"; that all the deals were on "margins"; and, finally, that plaintiff wrote the grain company that it had "scalped" the market on one of its deals—we are impelled to the conclusion that there was competent and substantial evi-

dence to warrant the court in submitting the case to the jury, and that its determination should stand.

We have examined the other errors assigned by appellant . and find them without merit.

We therefore recommend that the judgment and order appealed from be affirmed.

PER CURIAM: For the reasons given in the foregoing opinion, the judgment and order appealed from are affirmed.

*Affirmed.*

Rehearing denied April 5, 1922.