CARSON and others, Respondents, vs. MILWAUKEE PRODUCE
COMPANY, Appellant.

*September 24—October 15, 1907.*

*Trial: Questions for jury: Intent: Gambling contracts: Delivery:
Evidence: Relevancy: Sufficiency.*

1. Ordinarily in an action at law, and in those cases in which the
   law does not, from the act in question, conclusively infer the
   intent, the question of intention is one of fact for the jury.
2. Contracts in form for the sale or purchase of commodities, where
   neither party intends to deliver or accept the property nomi-
   nally sold, but where it is intended by both parties that the
   transaction shall be settled by the payment of the difference in
   prices according to the rise and fall of the market, are gambling
   contracts and void.
3. In an action on a contract for the sale or purchase of commodities
   for future delivery, express evidence by a party that delivery
   was intended or was not intended may be overborne by infer-
   ences from facts and circumstances.
4. An intention to "settle by the payment of differences," "betting
   on future prices," or "closing up without delivery by the pay-
   ment of differences," is equivalent to and means an intention
   by one who has sold for future delivery to buy for the same
   delivery, and to offset the purchase against the sale and receive
   or pay the difference.
5. In an action on a contract for the sale or purchase on the board
   of trade through brokers of commodities for future delivery,
   the intention as to actual delivery which is the object of judicial
   investigation is the intention which existed between both parties
   to the litigation, and not the intention which might have ex-
   isted between the two brokers who made the actual contract,
   although such latter intention is not wholly irrelevant.
6. Such intention may be established not merely by the assertions
   of the parties, but from all the circumstances attending the
   transaction, and is a question to be determined by the jury, or
   by the court in trials without a jury.
7. In an action for the balance claimed to be owing as the result of
   transactions had on a board of trade by plaintiffs as brokers
   for defendant, evidence of the fact that the transactions were
   board of trade contracts and that defendant had made prior

purchases which were closed out, not by deliveries, but by mak-
ing sales against the purchase before the day of delivery and
by offsetting one against the other, is relevant as tending in
some degree to indicate an intention that no delivery was con-
templated.

8. In an action for the balance claimed to be owing as the result
of transactions had on a board of trade by plaintiffs as brokers
for defendant, the evidence, stated in the opinion, is *held* suffi-
cient to take the case to the jury on the question of the intention
of both parties to the transaction, notwithstanding the direct
testimony of plaintiffs of their intention to make actual deliv-
eries.

9. In an action involving transactions had on a board of trade by
plaintiffs as brokers for defendant, it is *held* that it was not
inconsistent with a gambling intention on the part of the plaint-
iffs and defendant that transactions on the board of trade
may have been perfectly legitimate as between the brokers,
the immediate parties to the transactions.

APPEAL from a judgment of the circuit court for Milwau-
kee county: LAWRENCE W. HALSEY, Circuit Judge. *Re-
versed.*

The appeal is from a judgment rendered in an action at law
on contract. Respondents, whose partnership name is Car-
son, Craig & Co., are grain and seed brokers of Detroit, Mich-
igan, and members of the board of trade of that city. The
appellant is a corporation of Milwaukee, Wisconsin, dealing
in wool, products, beans, etc., having for its president and
principal manager one Herman Reel, who is a member of the
Milwaukee board of trade and familiar with board of trade
rules and transactions. Beginning on or about December 31,
1900, the defendant made a number of purchases for future
delivery of beans through the agency of the plaintiffs on the
Detroit board of trade prior to the transactions in question.
In each of these former cases the defendant, prior to the last
day of delivery, sold through the agency of the plaintiffs a
number of bushels or bags equal to the amount of its pur-
chases, and there was no delivery to defendant on any of

these prior purchases. The defendant then sold on the Detroit board of trade, through plaintiffs, beans as follows:

1902: Aug. 28.  1,333 1-3 bushels at $1.76 to Ferrin Bros. Co., October delivery.
Sept. 3.  666 2-3 bushels at $1.73 to Ferrin Bros. Co., Oct. delivery.
Sept. 5.  1,333 1-3 bushels at $1.68 to Parsons & Hobart, November delivery.
Sept. 6.  666 2-3 bushels at $1.69 to C. E. Burns, November delivery.
Sept. 8.  1,333 1-3 bushels at $1.72 to C. E. Burns, October delivery.
Sept. 17.  2,000 bushels at $1.70 to F. J. Simmons & Co., November delivery.
Sept. 24.  1,333 1-3 bushels at $1.79 to W. W. Murray, November delivery.
Oct. 1.  2,000 bushels at $2.05 to J. S. Lapham & Co., November delivery.

The defendant from time to time between September 11 and October 4, 1902, deposited with the plaintiffs margins on these sales, aggregating $3,850. The market price of beans rose rapidly on October 3d and following days. The defendant failed and refused to put up further margins, and the plaintiffs bought for defendant's account against such sales as follows:

1902: Oct. 6.  3,333 1-3 bushels at $2.45 from H. E. Botsford & Co., October delivery.
Oct. 8.  4,666 2-3 bushels at $2.35 from Parsons & Hobart, November delivery.
Oct. 8.  2,000 bushels at $2.35 from F. J. Simmons & Co., November delivery.
Oct. 8.  666 2-3 bushels at $2.35 from W. W. Murray, November delivery.

This left a net loss of $6,380.01 on the transactions, and, after applying defendant's margins of $3,850, left the plaintiffs' loss $2,530.01, for which sum, with $106.66 commission and some accrued interest, a verdict in favor of the plaintiffs was directed in the circuit court. The sales are made by the brokers in their own name to other brokers, neither seller nor purchaser disclosing his principal if he has one.

These contracts between broker and broker in form, both brokers being members of the board of trade, are made under

and conformably to explicit rules of such board here in evidence, providing for the deposit of margins or securities by the broker, the keeping up of such margins, the closing out by purchase of a like amount for the same delivery in case of defaulted sales, and the closing out by sale of a like amount for the same day of delivery in case of defaulted purchases. Against the liability thus assumed by the broker he requires from his principal the deposit called a "margin," which in case of a sale is required to be increased as the market price advances, or in case of a purchase to be increased as the market price declines, and the amount of the margin required is fixed by the broker with reference to the commodity dealt in, its market conditions, etc. The Detroit board of trade is organized by virtue of Act No. 166 of the legislature of Michigan entitled "An act for the incorporation of boards of trade and chambers of commerce," approved March 19, 1863 (Laws of 1863, No. 166). These rules provide, among other things, that deliveries of grain shall be by regular warehouse receipts; that in all sales for present delivery the bills shall become due immediately upon presentation of receipts, and in case of a failure to pay on such presentation the seller may at his option, as declared at the time, call the sale off or resell for buyer's account on the same day. "On maturity of contracts for future delivery this same rule shall apply." When any party is called upon for margins and fails to deposit the security or margins called within the next banking hour thereafter, the party making such call shall have the right, if he be the seller, to resell the property for account of the delinquent, such resale to be for the same delivery as was made in the original contract. If he be the buyer, he is to have the right to repurchase the property for the account of the delinquent, deliverable at the time named in the original· purchase. In either case he must at once communicate to the delinquent the action he has elected to take, and all losses or damages on such defaulted contract are at once due and payable, the same as though the contract had fully matured.

Carson v. Milwaukee Produce Co. 133 Wis. 85.

In cases where the contract is not made in the prescribed form found in rule 6, and the pr perty contracted for is not delivered at maturity of contract, the purchaser may, if he shall so elect, consider the contract forfeited, or he may purchase the property on the market for account of the seller by 1 o'clock p. m. on the day of maturity. In case any member of the association acting as a commission merchant shall have made purchases or sales by order and for account of another, whether the party for whom such purchase or sale was made shall be a member of the board of trade or otherwise, and it subsequently appears that such trades may be offset and settled by other trades made by the said commission merchant, he shall be deemed and authorized to make such offset and settlements, and to substitute some other person or persons for the one from whom he may have purchased or to whom he may have sold the property originally.

The contracts in question here, made between such members, have their inception in a quick and informal bid and acceptance. Thereupon a short memorandum is made on a ticket or card by each party and signed by him, except in case where the offers and bidding so result that there would be between two brokers two or more contracts, in which one of them was buyer in one of the contracts and seller in another. In such case no cards were exchanged, and only the difference, in whosesoever favor this might be, was paid. The sales or purchases thus made were reported by the broker to his principal, in cases in which he was acting for a principal, upon a printed blank containing a column for purchases and one for sales, introduced by the words: "We have the pleasure of confirming the following transactions made for your account and risk today." This blank contained a printed footnote as follows:

"We have this day made the above trades for your account, upon condition that Carson, Craig & Co. shall have the right to close this contract at their discretion whenever the usual margin of three cents a bushel, or such other margin as

Carson v. Milwaukee Produce Co. 133 Wis. 85.

has been agreed upon, is not kept good with them. Further, it is understood and agreed that these transactions are made subject to the rules and regulations of the market in which they are made; and it is expressly understood that we solicit and will receive no business except with the understanding that the actual delivery of the property bought or sold upon orders is in all cases contemplated and understood. Please examine immediately upon receipt, and telegraph if not correct."

The sales in question were reported to the defendant upon such blanks.

The plaintiffs' counsel insists, on the argument, that his clients did not believe that the *Milwaukee Produce Company* intended to deliver the beans on these contracts of sale, but did intend to leave it to the plaintiffs to buy in on the Detroit board of trade beans with which to make deliveries on the sale contracts made by plaintiffs for the defendant. The plaintiffs having testified to their intention to make deliveries, and the other brokers to whom they made sales or from whom they made purchases having corroborated them by sworn declarations of their intentions, it was claimed that the intention to make delivery appeared as matter of law. Considerable correspondence passed between the parties, all of which is in evidence. At the close of the evidence the plaintiffs moved the court to direct a verdict in their favor, which motion was granted, and to this ruling the defendant excepted. The defendant moved for the direction of a verdict in its favor, but also excepted to the refusal of the court below to submit the case to a jury on the principal defense made by defendant, which was to the effect that the contracts in question were gambling transactions and unlawful.

For the appellant there was a brief by *Churchill, Bennett & Churchill,* and oral argument by *W. H. Churchill.*

For the respondents there was a brief by *Winkler, Flanders, Bottum & Fawsett,* and oral argument by *C. F. Fawsett.*

TIMLIN, J. The pivotal question is whether there was evidence to take the case to the jury. Ordinarily, and in those cases in which the law does not, from the act in question, conclusively infer the intent, the question of intention is a question of fact for the jury in actions at law. Contracts in form for the sale or purchase of commodities, where neither party intends to deliver or accept the property nominally sold, but where it is intended by both parties that the transaction shall be settled by the payment of the difference in prices according to the rise and fall of the market, are gambling contracts and void. *Atwater v. Manville,* 106 Wis. 64, 81 N. W. 985, and cases cited in opinion. In the instant case the plaintiffs testified expressly to their intention to make delivery. The defendant's manager, who made the contracts for it, testified there was no intention on the part of defendant to make delivery. The real inquiry was: What was the intention of both parties, plaintiff and defendant? Express evidence by a party that delivery was intended or was not intended may be overborne by inferences from facts and circumstances. *Atwater v. Manville, supra.* In many of the cases we find the expression "settled by the payment of differences." In *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703, the expression used is "betting on future prices." An examination of the facts under consideration in such cases shows that the foregoing expressions were applied to, or at least included, the case of a broker, member of a board of trade, selling in his own name for future delivery for an undisclosed principal, with the intention of merely buying in for the same principal before the delivery day on the board an equal amount, and offsetting the sale against the purchase and paying or receiving the loss or gain, as the case might be. Such was the case of *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703; *Lowry v. Dillman,* 59 Wis. 197, 18 N. W. 4; *Everingham v. Meighan,* 55 Wis. 354, 13 N. W. 269; *Barnard v. Backhaus,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595;

*Donovan v. Daiber,* 124 Mich. 49, 82 N. W. 848; *De Mary v. Burtenshaw's Estate,* 131 Mich. 326, 91 N. W. 647; *Embrey v. Jemison,* 131 U. S. 336, 9 Sup. Ct. 776; *Harvey v. Merrill,* 150 Mass. 1, 22 N. E. 49; *Wagner v. Hildebrand,* 187 Pa. St. 136, 41 Atl. 34; *Jamieson v. Wallace,* 167 Ill. 388, 47 N. E. 762. An intention to "settle by the payment of differences," "betting on future prices," or "closing up without delivery by the payment of differences," is equivalent to and means an intention by one who has sold for future delivery to buy on the same board for the same delivery, and to offset the purchase against the sale and receive or pay the difference.

Was there any evidence in the present case to show that the parties plaintiff and defendant in this action both intended that the sales made by the plaintiffs for the defendant on the Detroit board of trade should be offset by corresponding purchases and payment or receipt of the differences? Before considering this further it may be well to say that it amply appears from cases last above cited that the intention which is the object of judicial investigation in such cases is the intention that existed between both parties to the litigation, and not the intention which might have existed between the two brokers, members of the board of trade, who made the actual contracts. Not that such latter intention is wholly irrelevant, but the controlling intention in a suit by the broker against his principal, like the instant case, is the intention entertained by the broker and his principal. All of the foregoing cases also support the rule laid down in *Jamieson v. Wallace, supra,* as follows:

"The intention of the parties to a contract for the purchase and sale of stocks may be established not merely by their assertions, but from all the circumstances attending the transaction, and is a question to be determined by the jury, or by the court in trials without a jury."

If, therefore, in the case at bar the plaintiffs and the defendant intended from the beginning that the sales made by

the plaintiffs for the defendant on the Detroit board of trade should before the day appointed for delivery be met by purchases of a corresponding amount for the same date of delivery by the plaintiffs for the defendant, and closed by offsetting these purchases against the sales and paying or collecting the difference, this case would be within the rule of the decisions above cited.

The evidence which we think sufficient to take the case to the jury upon this proposition is: *First.* The fact that the transactions in question were board of trade contracts, which is relevant as tending in some degree to indicate an intention that no delivery was contemplated, because a very large majority of the transactions on such boards are not real transactions, but are closed in the manner aforesaid. *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703; *Barnard v. Backhaus,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595. *Second.* In the several prior dealings in which the defendant, through the plaintiffs, purchased beans on the Detroit board of trade, the purchases were closed out, not by deliveries but by making sales against the purchase before the day of delivery, and offsetting one against the other. *Gardner v. Meeker,* 169 Ill. 40, 48 N. E. 307. *Third.* On September 26, 1902, the defendant wrote, asking the plaintiffs to remit the surplus margin, and saying: "You may change buying five cars Oct. and sell same for Nov. or Dec. at 6c. discount. We would prefer you to sell December, but do the best you can." True, this was not the act of the plaintiffs, but it was very suggestive to them and they received this communication from defendant, indicative at least of his intention. On September 27th the defendant wired plaintiffs: "If cannot do better change them at eight cents to December." Again, on the same day: "You may change the beans to Nov. or Dec. at 7 to 8 cts. difference." On September 29th plaintiffs wired defendant: "Think buy Oct. and sell November ten cents down. Shall we change? Answer quick." Plaintiffs did not ask for any money with which to make this purchase. *Melchert*

*v. Am. U. Tel. Co.* 11 Fed. 193. This may be understood as advising a purchase for October delivery to offset the October sales, and to change the sales for October delivery, or some of them, to sales for November delivery. Plaintiffs also wrote defendant on September 29th, stating that they had the order to sell two cars, 500 bags, of November beans, at $1.94, and to buy five cars, 1,250 bags, October, and sell the same amount of November at six cents discount. This might indicate their understanding of the manner in which the sales should be closed. On September 30th plaintiffs wrote defendant, saying, among other things: "We think the sooner you get out of your Oct. sales the better. Possibly it may be best to take them in altogether, or it may be best to change them into Nov. However, we would advise covering them as soon as possible." On October 3d plaintiffs wired and wrote defendant, advising it to take in its October sales. *Fourth.* The defendant's manager testified that no deliveries were intended on the part of defendant.

This evidence seems to us to have been sufficient to take •the case to the jury on the question of the intention of both parties to this transaction between plaintiffs and defendant, notwithstanding the direct testimony of the plaintiffs of their intention to make deliveries. It must be borne in mind that it is not inconsistent with the gambling intention on the part of plaintiffs and defendant that transactions on the Detroit board of trade may be perfectly legitimate as between brokers, the immediate parties to such transaction. Even legitimate transactions furnish many opportunities for collateral wager contracts and gambling, and two persons, broker and principal, knowing the usual way of settling on the board of trade, and knowing that delivery can be insisted upon by either party who is a member of the board of trade and a party to the sale or purchase, but at the same time knowing that, notwithstanding this, these deliveries are very rarely insisted upon, may well enter upon a single trade or a series

of trades with the intention that no actual commodities shall be received or delivered but the transactions closed in the manner before described. Whether or not the plaintiffs and defendant in the instant case had such intention was a question of fact and should have been submitted to the jury.

This renders unnecessary the consideration of other questions argued.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded for a new trial.