### ALLEN v. DENMAN. (No. 2537.)*

(Court of Civil Appeals of Texas. Amarillo. Oct. 28, 1925. Rehearing Denied Nov. 25, 1925.)

1. **Gaming** ⚫ 36 — **Where principal knowingly contracted with brokers for illegal purchase of cotton, subsequent attempts by brokers to conform to statute held a variance from principal's offer, preventing contract from arising.**

Where principal, in purchasing contracts for cotton on margin, never intended to accept or deliver any cotton, in violation of by-laws of New Orleans Cotton Exchange and United States Cotton Futures Act, § 5, as amended by Act March 4, 1919 (U. S. Comp. St. Ann. Supp. 1919, § 6309e), and Penal Code Texas 1911, art. 539, which intention was known to brokers, any subsequent attempts by brokers to comply with above statutes would be a variance from principal's offer, preventing contract from arising, and precluding broker from recovering advancements made by him for principal.

2. **Gaming** ⚫ 36—**Broker illegally dealing in futures for principal held not entitled to recover advancements made for principal.**

A broker, illegally dealing in futures by buying contracts for cotton for principal, in violation of by-laws of New Orleans Cotton Exchange and U. S. Cotton Futures Act, § 5, as amended by Act March 4, 1919 (U. S. Comp. St. Ann. Supp. 1919, § 6309e), and Penal Code Texas 1911, art. 539, cannot recover advancements made in such transactions for principal, since there can be no such thing as agency in doing of an unlawful act; all parties being principals and neither entitled to contribution.

3. **Gaming** ⚫ 11—**Party admitting violation of law against gambling in futures held guilty without regard to intent of broker through whom he acted.**

Under Pen. Code 1911, arts. 540, 545, and 546, punishing dealings in futures, as defined by article 539, a party admitting that he had been violating such law is guilty of gambling in futures, without regard to criminal intent of broker through whom he acted.

4. **Gaming** ⚫ 49(3)—**Evidence held to show that broker, in purchasing contracts for cotton, did not intend actual delivery.**

In broker's action to recover advancements, evidence *held* to show that broker, in purchasing contracts for cotton for principal, did not intend that cotton purchased and sold should be actually delivered, thereby violating by-laws of

New Orleans Cotton Exchange and U. S. Cotton Futures Act, § 5, as amended by Act March 4, 1919 (U. S. Comp. St. Ann. Supp. 1919, § 6309e), Pen. Code 1911, art. 539, and where principal admitted that he was gambling in futures and did not intend to accept or make delivery, the mutual illegal intent at time of contract existed to make contract for purchase of cotton illegal.

**5. Gaming ⊕⟹2—Contracts for purchase of cotton, made in Texas, are governed by lex loci contractus, and not validated by subsequent contract purporting to be made in Louisiana.**

Where contracts for cotton were made in Texas, whether made with Texas broker or New Orleans stock exchange member, represented by broker, they are governed by the lex loci contractus, and dealings between principal and broker, being illegal in Texas in their inception, are not validated by subsequent contract between broker and stock exchange member purporting to be a legal transaction in Louisiana; such dealings being separate.

### On Motion for Rehearing.

**6. Appeal and error ⊕⟹1175(5)—Court of Civil Appeals held authorized to render such judgment as trial court should have rendered.**

Under Rev. St. 1925, art. 1856, Court of Civil Appeals is authorized, when judgment of trial court shall be reversed, to proceed to render such judgment as court below should have rendered, except when it is necessary that some matter of fact be ascertained on damage or matter to be decreed is uncertain, in which cases the cause will be remanded for new trial; and where appellee does not show that on another trial it is possible for him to introduce evidence to strengthen his case, the court on appeal will render such judgment as trial court should have rendered.

**7. Gaming ⊕⟹50(1)—Where no room for doubt as to illegality of contract which was basis of suit, court should have directed verdict for defendant.**

Where evidence of plaintiff's witness and all the circumstances surrounding transaction left no room for reasonable doubt as to illegality of cotton futures contract, for which advancements sued for were made, the court should have directed a verdict for defendant.

Appeal from District Court, Lubbock County; Parke N. Dalton, Special Judge.

Action by Sam S. Denman against G. C Allen. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Robt. H. Bean and Bean & Klett, all of Lubbock, for appellant.

Wilson & Douglas, of Lubbock, for appellee.

HALL, C. J. Sam S. Denman, appellee, sued G. C. Allen, appellant, to recover the amount of a check for $1,500, which the appellant alleges was given in settlement of his losses in a cotton futures transaction. Denman alleged, in substance, that during the months of February, March, and April, and prior thereto and since said time, he was a member of the New Orleans Cotton Exchange, and engaged in the business of a cotton broker at Lubbock; that Alex Hyman & Co. of New Orleans were also members of said Exchange, and that he, acting as broker and agent for Allen, bought for said Allen contracts for cotton on said Exchange through Alex Hyman & Co, and that Allen, acting through him as his agent and broker, bought and sold contracts for cotton through said Alex Hyman & Co. on the New Orleans Cotton Exchange on various dates during said three months, aggregating in all 2,800 bales; that all the cotton and contracts bought by said Allen are subject to the by-laws, rules, and conditions of the New Orleans Cotton Exchange, and subject to the United States Cotton Futures Act, § 5, as amended by Act March 4, 1919 (U. S. Comp. St. Supp. 1919, § 6309e), and were made with the distinct understanding and agreement that all orders for the purchase and sale of cotton were received and executed with the distinct understanding that actual delivery was contemplated in accordance with the requirements of section 5 of the United States Cotton Futures Act as amended; that the $1,500 check dated April 8, 1924, was given by Allen to pay the balance due by him to Alex Hyman & Co. and was indorsed by the plaintiff and deposited to the credit of Hyman & Co. in the Security State Bank & Trust Company, and after Allen refused payment of said check, plaintiff was required to and did pay said $1,500 to Hyman & Co.; that it was further understood that on all marginal business the right was reserved by Alex Hyman & Co. to close transactions when margins were running out, without further notice, and to settle contracts; that upon instruction and orders from Allen plaintiff would wire such orders to Hyman & Co. at New Orleans, who would immediately carry out the orders of the defendant, Allen, and purchase said contracts for the cotton as directed by Allen, and mail to Allen confirmation of each order; that under his instructions Hyman & Co. sold out said contracts, and after crediting Allen's account, there was a balance of approximately $1,500 due from Allen which plaintiff was bound to pay and did pay Hyman & Co.; that all contracts and orders for the purchase and sale of the cotton were wholly Louisiana contracts, and were carried out in the state of Louisiana.

Allen pleaded a failure of consideration for the check, and also failure of consideration for the confirmation contracts, in that plaintiff did not pay or promise anything of value therefor, nor did the defendant receive any benefit or value for said check; that he did not know that plaintiff was acting as his agent, but understood that he was acting as

the representative for some one else connected with said cotton exchange; that plaintiff was not the agent or representative for defendant; and had no authority to act for him in the execution and delivery of contracts; that said contracts were not bona fide, but were illegal, void, and contrary to the statutes, laws, and decisions of the United States, Louisiana, and Texas, and wholly against good morals and public policy; that it was understood and contemplated by all parties connected with said transaction that there would be no actual delivery of cotton, and that the transactions were merely gambling ventures and deals in futures on said Exchange; that there was no intention of making actual delivery of cotton or of carrying out the transactions; that margins were deposited merely to take care of losses which might result by reason of advances or declines in the market according as the dealer would sell or buy on the board; that none of the parties had the money or intended to get the money to pay for the cotton bought or sold; that they had no facilities for handling the cotton, such as cotton yards, warehouses, etc., and that said check was merely a continuation of said illegal transaction, and was part of the gambling scheme given to cover margins in wagering on the future cotton market, and not as a payment for cotton actually delivered or intended to be delivered.

Two issues were submitted to the jury, and answered as follows:

"First. Did any of the parties to the transactions for the purchase and sale orders contemplate an actual delivery of the cotton called for? Answer: Yes.

"Second. Did the plaintiff, Denman, or any of the persons from whom defendant's cotton contracts were purchased, contemplate a delivery of said cotton? Answer: Yes."

Based upon the verdict, judgment was entered for plaintiff for the full amount of the check.

The appellant's first contention is that the evidence conclusively shows that, in these transactions with the firm of Denman & Harding, he was simply buying futures, with no intention whatever that any cotton should ever be delivered by any one; that it was a gambling transaction, and that the parties to the contract so understood it. It is true that the plaintiff, Denman, in whose name the suit was filed, alleged that he bought contracts on the New Orleans Cotton Exchange through Alex Hyman & Co., and that it was further understood that on all marginal business Hyman & Co. reserved the right to close the transactions when the margins ran out, and to settle the contracts without further notice; but this pleading was not introduced in evidence.

[1] It is clear that Allen never intended to accept or deliver any cotton whatever when he told either Denman or Harding to buy or sell for him. He states that several times in his evidence, and it is uncontradicted that, when he "bucked the board," he was simply gambling upon the rise and fall of the cotton market, and that both Denman and Harding knew that such was his intention. Their acceptance of his proposal must have been identical with its terms, and the result of any subsequent attempt upon their part to qualify it, or ingraft conditions upon it, is that the minds of the parties did not meet and no contract was ever made. This is elementary. If, in complying with his orders to buy or sell, they or the New Orleans brokers, Hyman & Co., for whom they acted in the transactions, endeavored to make the rule of the New Orleans Exchange, implying and requiring delivery, a part of the contract. Allen would not be bound by it. It would be an acceptance variant from his offer. Allen was not a member of the New Orleans Cotton Exchange, and said he knew nothing of its rules and regulations. Hyman & Co. could not alter the terms of the contract which their representatives Denman & Harding had made with Allen by sending what they termed a written confirmation after the contract was closed, and after they had Allen's margin in their possession.

[2, 3] After Allen refused to pay the check for $1,500 which he had given Denman in settlement of his losses, this suit was filed; and the appellee contends that, as a broker and agent of Allen, he is entitled to recover the amount advanced by him upon the faith of the check to Hyman & Co. upon the ground that he acted as the agent of Allen, and under the rule of law that a broker is entitled to be reimbursed for advances and expenditures made for his principal, even upon a wagering contract. We cannot assent to this proposition. There is no such thing as agency in the doing of an unlawful act. The parties are all principals, and neither is entitled to contribution. This rule is a part of the fundamental law of agency and contracts, and is so ably and fully discussed in volume 1, Mechem on Agency (2d Ed.) §§ 81, et seq., that we deem further discussion unnecessary here. The same eminent author further shows that the law is equally well settled that a broker cannot claim reimbursement while knowingly acting for his principal in an illegal transaction. Id. §§ 111 and 2481. Chapter 3 of the Penal Code of Texas 1911, art. 539, defines futures or dealing in futures, in part, as follows:

"1. A sale or purchase, or contract to sell, or any offer to sell or purchase, any cotton, grain, meat, lard, or any stocks or bonds of any corporation, to be delivered in the future, when it was not the bona fide intention of the party being prosecuted under this chapter, at the time that such sale, contract, purchase, or offer to sell or purchase, was made, that the thing mentioned in such transaction should be delivered and paid for as specified in such transaction.

"2. Any such sale, purchase, offer or contract, where it was the intention of the party being prosecuted hereunder at the time of making such contract or offer, that the same should, or, at the option of either party, might be settled by paying or receiving a margin or profit on such contract.

"3. Any purchase, sale or offer of sale or purchase, or contract for future delivery or any of the things mentioned in this article on, by or through any exchange or board of trade, the rules, by-laws, customs or regulations of which permit such contract or transaction to be settled or closed by delivery or tender of any grade or grades of the thing mentioned in such contract or transaction, other than the grade upon which the price is based in said transaction, at any price other than the actual price for spot delivery of such other grade or grades, at the time and place of the delivery or tender."

Article 540 of that chapter provides that punishment shall be two years' confinement in the penitentiary for violation of its provisions. Article 545 provides that proof by the state that such a contract for future delivery has been made will constitute a prima facie case for the state upon the issue, and places the burden upon the defendant to prove that the thing so contracted for or offered was, in fact, delivered in accordance with the contract, or that it was the bona fide intention of the defendant at the time of making such contract that such thing should be so delivered. Article 546 provides that if the rules, regulations, by-laws, or customs of the exchange, by or through which the contract was made, permitted such contract to be settled by the delivery of any grade of the thing mentioned other than the grade upon which the price was based, or at any price other than the actual price for spot delivery of such grade, shall constitute a prima facie case for the state.

Allen freely admitted that in dealing with the plaintiff and Harding he was violating the above-quoted law, and stated he had been gambling in cotton futures for about 15 years. The effect of the above quoted statute is to render him guilty, without regard to the criminal intent of Denman and Harding.

[4] In civil actions, the courts have prescribed as the test of the legality of such contracts that it must appear that the illegal intention was mutual, and that it existed at the time the contract was made. If this test is to govern in the determination of the issue before us, the next inquiry is, Did Denman and Harding intend, at the time the various contracts with Allen were made, that the cotton purchased and sold should be actually delivered? We have carefully reviewed the statement of facts, and have concluded that they did not so intend. They required Allen in the beginning to deposit $1,000, which they both admit was a margin to protect them and Hyman & Co. in subsequent deals. The record shows that there were 28

transactions within a period of 45 days, in which contracts for 100 bales of cotton were either sold or purchased in each transaction. As shown by the plaintiff's books, the average price for the cotton was over 27 cents per pound, which would be over $150 per bale, or exceeding $15,000 in every transaction. Both the plaintiff and Harding admitted that they did not require of Allen any further deposit, although his margin was reduced several times during the 45 days by losses. Neither of them contended that the $1,000 was deposited as earnest money or as first payment for the purchase of any $15,000 worth of contracts. Most of the transactions were made and closed the same day, though a few of them were "left open" or permitted to "ride" for two or three days. The contracts nearly all called for July deliveries, but were closed within a few hours, and settlement was made according to the difference in the market price. Denman testified that during that time he "didn't know that Allen had even a bale of cotton, or anything to get a bale with." He gives the history of the origin of the check as follows:

"As to whether or not this $1,500 check that the suit is brought on was put up there by Mr. Allen to margin his account with Alex Hyman & Co.—we should have never had this check, but I will explain how we got this check. Mr. Allen, I think it was, had 300 or 400 bales in there, I don't remember the exact number, and the market—I believe he was buying cotton—and the market broke probably 200 points that day, and Alex Hyman wired me that Mr. Allen's account at the margin had exhausted, and I told Mr. Allen, and he said to leave it in there a while; he said, 'If I owe you anything I will give you my check for the whole thing,' and I said, 'All right;' so I left it in there, and along before the market closed, I don't remember exactly the time, he came to me and said, 'Lets buy those contracts in,' and he bought them in or sold them out, I don't remember, but he bought or sold enough cotton to balance his account, and there was a loss of $1,487. We were pretty busy, and I didn't have time to figure it up then, and he said 'I want to go home; I will give you my check for $1,500; that will cover it, and I will stay out of the market three or four days, and then I will come back and trade some more,' and I said 'All right, Mr. Allen, that is fine; I am sorry you lost.' That was when the market was breaking pretty fast I think. That is the reason I required him to give me a check for that amount of $1,500. He was closed out on that day. The contracts were closed out on the 8th, but the confirmations were mailed out on the 9th."

Plaintiff further testified that he knew nothing of Allen's financial condition, but two parties had told him that Allen's check was good up to $3,000 or $4,000.

Hyman's letters of confirmation, mailed out after the deals had been closed, did not show to whom the cotton had been sold, nor the day of delivery, nor did they show from whom Allen had purchased. Harding said

they never knew who the other party was to Allen' contracts of sale and purchase, and neither did those who sold to or purchased contracts from Allen know who they were dealing with. Such written confirmations, therefore, lacked the essentials of a contract. The witness Fortier, one of the firm of Hyman & Co., testified as follows:

"As to whether or not there was any cotton ever physically delivered or turned over by or to G. C. Allen or any one for him, there was no cotton delivered or received for G. C. Allen, as to whether or not Alex Hyman & Co. kept a fund or deposit for the purpose of covering margins on the transactions in question, Alex Hyman & Co., as brokers, required margins for the account of G. C. Allen for the protection and as payment on account for the fulfillment of obligations incurred by G. C. Allen in the purchase and sale of cotton."

The record discloses that Denman, Harding, and Fortier reluctantly and evasively answered the questions propounded to them by appellee's counsel in his effort to get the real facts and motives relating to the contracts. Denman denominated Allen's transaction as "playing the cotton market," and further testified, with reference to. his transactions generally, as follows:

"I didn't actually get any cotton, but McFadden bought 292,000 bales today, and if I had some to deliver he might buy it. He did not buy just like Allen did. He received spots from other men who executed those orders. He will actually receive the cotton in the next day or two. He has contracted for it, given an order for it, and it is just a question of grading it out. McFadden didn't have any more to do with this than anybody else; * * * I think that all orders for the sale and purchase of cotton handled like Allen's, were handled on the board of the New Orleans Exchange. * * * Our exchange here was not handled on the same basis and same methods as the New Orleans Cotton Exchange; neither was it as far as executing orders for sales and purchases; they executed theirs from the Ring, and there are only two Rings in the United States. * * * I don't think my office runs anything like the office of Alex Hyman. All I did was wire Hyman that I wanted to buy 100 bales, and he bought it and wired me back what he bought it for. I was not provided by any of my customers with the entire amount of the purchase price of the cotton that I bought for them. I was not furnished the names of the purchasers on these contracts when Hyman & Co. would sell. When Mr. Allen would come and ask me to sell him 100 bales of cotton, I would have Hyman & Co. execute the order, and Hyman & Co. would make the sale and wire back a report, and then send by mail the confirmation to me and to Allen—mail Mr. Allen the original and me the copy—and that is one of them there I think. That doesn't show to whom the cotton was sold, and the same is true with reference to the cotton that was bought for Mr. Allen; it didn't show who Mr. Allen was buying the cotton from."

The copy of Allen's account with plaintiff's exchange, and the testimony of Denman him-self, shows that Allen bought "contracts" instead of cotton. Allen's orders were verbal, and it is admitted that, during the 45 days while Allen was plaintiff's customer, not a bale of spot cotton actually changed hands under any of his contracts. The efforts of appellant's counsel to get the real facts from Denman and Harding, and the abortive result of such efforts, are illustrated by the following excerpts from the statement of facts:

"Q. As a matter of fact, in conducting these transactions, you knew, didn't you, that there would not be any actual delivery of cotton by Mr. Allen? A. No, sir; if I did know it and was to admit it the United States government would put me in the penitentiary before the sun would go down.

"Q. You are not going to admit it then, are you? A. No; really I am trying to be a law-abiding citizen. That is one of the acts of the United States that there is no gambling in cotton futures.

"Q. When you received orders from G. C. Allen, in which he was to sell 1,200 or 1,400 bales of cotton, and you kept in contact there with him for days and days, and you knew that he was not going out and buy any cotton and was not making any preparations to, you really did not expect Allen to be shipping 1,200 or 1,400 bales down to New Orleans? A. He didn't have 1,200 or 1,400 bales of cotton on hand at any one time.

"Q. Or even 100? A. I did not ask him what he was going to do with it; and it was not any of my business.

"Q. I am asking your innermost feelings; I ask you what you had in your mind when the transactions were being carried on; tell this jury if whether or not in your mind you believed or had any intention that G. C. Allen would be shipping or making actual delivery of this cotton that he had sold. A. No; I don't know what he was going to do with the cotton.

"Q. You didn't believe, down in your heart, that G. C. Allen was going to deliver any of that cotton—make an actual physical delivery of it? A. If it is in my heart it is going to stay there; I don't know whether he was going to deliver it or not.

"Q. I am asking what you believe. A. I believed this check would be good."

At this point Denman's counsel told him to answer the question, and he answered:

"Certainly I thought he was going to deliver the cotton.

"Q. You mean to tell the men on the jury— A. I mean to tell the men that he came up there and ordered me to buy 100 bales of cotton, and he was supposed to deliver it, and he ought to be man enough to do it.

"Q. Tell the jury whether or not you believe or had any intention, as far as you were connected with the transactions, to. have actual delivery of the cotton. A. We intended to have actual delivery of that cotton.

"Q. You believed that Allen would make actual delivery of the cotton? A. Yes, sir; certainly.

"Q. He would actually buy and pay money for the cotton he was buying? A. I expected him

to; if he didn't, I didn't know where he would get it.

"Q. Did you really intend that he would pay the money for the cotton he bought in New Orleans? A. I didn't know how else. he would have gotten it; they generally pay for it or steal it.

"Q. He didn't get it? A. Hasn't yet.

"Q. The various customers you had over there, in which you have .detailed of their negotiations through your exchange handled similar to the Allen deals, tell the jury whether or not any of those sales were actually carried out and cotton physically delivered. A. I am to tell you whether—

"Q. Whether any actual deliveries were made by you or anybody connected with the transactions. A. Judge, that is really impossible for me to answer."

Then the witness stated:

"Transactions for customers, generally, through my office were handled similar to Mr. Allen's; they were all handled alike. 'The orders and sales were handled the same way, on the buying and selling proposition. In making these statements from time to time, when the customer would be charged up or credited with a certain amount on a sale or purchase of cotton, that was on the basis of the market value of cotton on the New Orleans Cotton Exchange Board, and the account would be closed in that manner; there would probably be an adjustment on one side or the other."

After Harding had testified that he and Denman represented Hyman in dealing with Allen, the following colloquy is shown by the statement of facts while appellant's counsel was interrogating him:

"Q. I want to ask you to face the jury and tell them whether or not, down in your heart, you expected to see an actual delivery of this cotton by G. C. Allen; just look at the jury and tell them. A. All right; you want me to answer it in my way?

"Q. Answer my question, whether or not, down in your heart, you actually expected a physical delivery.

"Appellee's Counsel: Same objection as to the same questions to Mr. Denman.

"Q. We want to get down to the truth; look the jury in the face and tell these men whether or not you expected an actual delivery of this cotton by G. C. Allen. A. Whenever a trade—

"Q. Wait a minute—

"Appellee's Counsel: He can answer it in his own way.

"Appellant's Counsel: I will ask that he give Yes or No.

"Appellee's Counsel: The question cannot be answered, intelligently, 'Yes' or 'No.' It is irrelevant and immaterial what he thinks down deep in his heart and is trying to intimidate him. It is not a proper question, and without any bearing on this case, because Hyman was selling it. The witness has a right to answer it in his own way.

"The Court: Can you answer it 'Yes' or 'No'? A. You mean can I answer the question 'Yes' or 'No'?

"The Court: Answer my question; can you answer it 'Yes' or 'No'? (Stenographer reading the question.) A. I don't know whether I can or not; it would take some explanation to do it.

"The Court: Go ahead and make the explanation and answer the question."

The witness then gave the rule of the New Orleans Cotton Exchange, stating that delivery was implied, and said:

"It doesn't make any difference to us. Deep down in my mind I don't know what.Mr. Allen's intentions were. Do you understand the position I am in?

"The Court: Yes, sir; did you expect at the time that he would deliver the cotton? A. It is understood, when a man makes a trade, that he is to deliver it whether I expect it or not.

"The Court: I didn't ask you that; I ask you if you expected it; did you expect a delivery of the cotton? A. Did I expect a delivery of it?

"The Court: Yes, when Mr. Allen bought it here, you expected it to be delivered to him? A. I expected Mr. Allen to take up his contract if he didn't resell it.

"The Court: Did you expect him to deliver the cotton? A. I would have to answer it 'Yes.' "

Allen testified, in rebuttal, that he did not request either the plaintiff or Harding to make any sales or purchases, nor did he give them any orders, more than to buy it at that time and close it out on the board; that they did not make any arrangements with him about receiving the purchase price of cotton contracts sold for him, nor was anything said by them as to who would furnish him the money to pay for the cotton; that he had no cotton, and didn't expect to deliver or receive any; that he received nothing for the $1,500 check; that he never received any papers or any statements showing the closeout of his credit at all; that he only received one confirmation showing that he sold 30:03, did not get any more at all, and that Denman told him his profits at that time amount to about $2,900; that he waited to get something from New Orleans in regard to it so he could draw down his money, but never received anything. Denman told him he would get a check from Hyman in a few days, but no statement or check was ever received; that he didn't know anything about the rules and regulations of the New Orleans Cotton Exchange; that he was not complying with the law, but was "bucking the board," and that he could not comply with the law if he went in there and got out. He further stated that he knew that under the Federal Futures Act, the cotton must be delivered if demanded, but that he was not dealing in that way on cotton; that he was in the plaintiff's exchange on the gambling side, "shooting going and coming," and did not know whether they were running it according to the United States law or not; that it did not look like it.

[5] Denman and Harding said they represented Alex Hyman & Co. in the deals with Allen, and that Hyman paid them their commissions monthly; so, whether Allen's contracts were with plaintiff or Hyman & Co.,

they were made in Texas, and the lex loci contractus controls. The deals between Allen and Denman, being illegal in Texas in their inception, are not validated by a subsequent contract between Denman and Hyman, masked in the habiliments of a legal transaction made in Louisiana. They are two separate deals, and one may be illegal and the other prima facie or actually valid. 3 Williston on Contracts, §§ 1671, 1672; Carson v. Milwaukee Produce Co., 133 Wis. 85, 113 N. W. 393; Kassuba Commission Co. v. Blodgett, 155 Wis. 529, 143 N. W. 1060, 145 N. W. 177. If Denman made contracts with Hyman which Allen had not authorized him to make, then he cannot recover in this action. Hyman's letters of confirmation were no part of his contracts with Allen, and added nothing to their legality, because illegal contracts of that kind cannot be ratified or confirmed even by the parties themselves, and certainly not by a third party. Even under the mask of strict compliance with the rules of Exchanges and Rings, contracts may be, and frequently are, made which are, in reality, wagers. Fiske v. Doucette, 206 Mass. 275, 92 N. E. 455, and authorities cited. It is true that Denman and Harding finally testified that they believed that actual deliveries of spot cotton would be made under the Allen contracts, but it was after they had been told by their counsel to answer the questions, and had been grilled by the court and driven into a corner by opposing counsel. These statements, corkscrewed from them, are flatly contradicted, not only by the circumstances surrounding and attending the deals, but by their own testimony. They may have been justified in believing that deliveries would be made under the first few contracts, but in the face of the fact that day after day for more than six weeks Allen had dealt with them without delivering or tendering any cotton, and they had settled with him time and again his gains and losses, sympathizing with him when he lost, and encouraging him to try again, their assertion that they expected deliveries is too absurd for serious consideration. 2 Page on Contracts, § 841.

In Norris v. Logan, 94 S. W. 123, the Court of Civil Appeals said:

"Gambling is none the less such because it is carried on in the form or guise of legitimate trade. It might, therefore, be the case that a series of transactions, such as those described in the present record, might present a succession of contracts perfectly valid in form, but which on the face of the whole, taken together and in connection with all the attending circumstances, might disclose indubitable evidence that they were wagers. Irwin v. Williar, 110 U. S. 499, 4 S. Ct. 160, 28 L. Ed. 225. In the case of Embrey v. Jemison, 131 U. S. 336, 9 S. Ct. 776, 33 L. Ed. 172, the court uses this language: 'The mere form of the transaction is of little consequence. If it were, the statute against wagers could easily be evaded. The

essential inquiry in every case is as to the necessary effect of the contract and the real intention of the parties.' The four contracts upon which this suit is based are in form valid, in that they purport a sale of the commodity to be delivered in the future; but, when their form is considered in connection with the agreement to pay and the payment of margins to cover fluctuations of the market price of the commodity and the method of performing such contracts by the payment of the profits or losses which arise from the difference in the contract price of the commodity and its market price at the time and place of delivery they show the transactions to be wagers."

When that case reached the Supreme Court, the judgment of the Court of Civil Appeals was affirmed. While the case was decided upon the pleadings, the facts alleged are practically the same as are disclosed by the evidence in the instant case. Judge Brown said (100 Tex. 230, 97 S. W. 821):

"It is also alleged, in substance, that Sanger & Ettelson had the right to close out the contracts when they were unwilling to risk greater advances upon them, so as to keep the plaintiffs in the market. * * * The plaintiffs alleged in their petition that they sold 400 bales of cotton through Sanger & Ettelson, brokers and members of the Cotton Exchange of New Orleans. While they alleged that the defendant sold cotton for them, facts are alleged which conclusively show that plaintiffs understood the transaction to be one in which there was no intention to deliver the cotton. For it is said, in substance, that the whole transaction was to be carried out by Sanger & Ettelson in their own names by paying the losses and receiving the profits; that is, the difference between the price at which the sale was made and the market price of the contract at the time of sale was either received as profits or paid as a loss. This distinctly shows that, at the time of the transaction, it was not in the minds of the plaintiffs to deliver the cotton upon the contract made for them. Indeed, they could not have done so, for the reasons: First, that they did not know the purchaser of the contract; and, secondly, the transaction had to be concluded in the Cotton Exchange in New Orleans, of which they were not members. The allegation in the petition that they could and would have furnished the cotton for actual delivery, if called upon, does not show that they contemplated so doing, for there was not an allegation in the petition that they ever intended to deliver any cotton to Sanger & Ettelson, to be by them delivered to the purchaser of the contract. Testimony could hardly be more conclusive of the intent with which plaintiffs consummated these transactions than are the facts alleged in their petition. * * * The plea in reconvention virtually sets up the same facts as to the sale of the cotton as does the petition, but, in connection with that allegation, it is alleged, as it was in the petition, that Sanger & Ettelson were in the brokerage business, and that they caused to be bought and sold for their customers in their own name through the New Orleans Cotton Exchange contracts for future delivery of cotton, and that the New Orleans Cotton Exchange is a cotton market where contracts for

future delivery of cotton are bought and sold by its members either for themselves or their customers. It will be observed that, when they come to allege the facts with regard to the manner of transacting the business, the defendants allege that their business was to buy and. sell, not cotton, but contracts for future delivery of cotton, and that the New Orleans market was a place where contracts for sale of cotton for future delivery were bought and sold.

"A significant fact with regard to the pleadings of both parties is that they nowhere allege that it was intended that cotton should be actually delivered upon the contracts, nor is there any day in December alleged as being the time at which delivery was to be made. The allegations of the defendants' plea in reconvention are to the effect that the value of the contract for delivery of cotton in December was not ascertained by reference to the price of cotton at any day of, or even in, the month of December, but it was ascertained by the market price of the contract of sale in the New Orleans market at the time. when it was determined what was necessary to be furnished in order to keep the plaintiffs upon the market. Suppose the plaintiffs had insisted upon delivering cotton under the contract, and had gone to New Orleans for that purpose, upon what day of the month of December would they have made the tender, and to whom could they have tendered it? There is such a marked difference in the alleged manner of settling profits and losses on these contracts for future delivery, and the well known rule of law, which governs in determining the rights of the parties upon a failure to comply by actual delivery, that there can be no question that there was not, in the minds of either of the parties to this transaction, any expectation that cotton would be actually delivered by Sanger & Ettelson for and on account of the plaintiffs. A very potent fact is that, while Sanger & Ettelson were to transact the whole business, no money was provided with which they should buy cotton for delivery. Such contracts as those set forth in the pleadings in this case are against public policy and contrary to article 377, Pen. Code 1895. Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787."

The appellant further insists that the court erred in refusing to suppress the depositions of Fortier, because the witness had evasively answered the cross-interrogatories propounded to him. We think the deposition should have been suppressed; but this becomes immaterial, in view of the fact that, under the first proposition, we have concluded that the verdict of the jury is contrary to the evidence.

For the reasons stated in disposing of the first proposition, the judgment is reversed and is here rendered for appellant.

Reversed and rendered.

### On Motion for Rehearing.

[6] The appellee insists that this court erred in reversing and rendering the judgment, and insists that the Court of Civil Appeals is not authorized, in cases of this character, to reverse the judgment of the trial court based upon the jury's findings upon special issues and render a judgment for the appellant. Under R. S. 1925, art. 1856, this court is authorized, when the judgment of the trial court shall be reversed, to proceed to render such judgment as the court below should have rendered, except when it is necessary that some matter of fact be ascertained on the damage to be assessed, or the matter to be decreed is uncertain; in either of which cases the cause shall be remanded for a new trial.

The appellee does not show that upon another trial it is possible for him to introduce any evidence which would strengthen his case. Though the trial court, in cases of a special verdict, must render judgment thereon or set it aside, a Court of Civil Appeals, under the authority of this article, on the reversal of a judgment, is authorized to render such judgment as the court below should have rendered. It appears that the issues have been fully developed by both sides, and that no different result would probably be reached by remanding the judgment.

[7] Aside from the evidence of Allen, we think the court should have directed a verdict, because the testimony of appellee's witnesses, and all of the circumstances surrounding the transaction, left no room for a reasonable doubt upon the issue of the illegality of the contract. The facts in this case are much stronger, and more clearly demonstrate that the contract was illegal, than the facts in the case of Norris v. Logan (Tex. Civ. App.) 94 S. W. 123, Id. 100 Tex. 228, 97 S. W. 821. That case was submitted to a jury. The Court of Civil Appeals reversed the judgment and dismissed the case, apparently for the reason that the pleadings of both parties showed that it was a gambling contract, and the Supreme Court, after a more detailed statement of the pleadings and evidence, affirmed the judgment of the Court of Civil Appeals.

We think we have acted within the limits of the powers granted us by the above statute. Henne & Meyer v. Moultry, 97 Tex. 216, 77 S. W. 608; Willoughby v. Townsend, 93 Tex. 80, 53 S. W. 581; Arno Co-op. Irr. Co. v. Pugh (Tex. Com. App.) 212 S. W. 470; Houston Belt & Terminal Ry. v. Lynch (Tex. Com. App.) 221 S. W. 959; Cain v. Bonner, 108 Tex. 399, 194 S. W. 1098, 3 A. L. R. 874; Id. (Tex. Civ. App.) 149 S. W. 702; G. H. & S. A. Ry. Co v. Drew, 59 Tex. 10, 46 Am. Rep. 261; Krause v. City of El Paso, 101 Tex. 211, 106 S. W. 121, 14 L. R. A. (N. S.) 582, 130 Am. St. Rep. 831; Id. (Tex. Civ. App.) 101 S. W. 828.

In the Norris-Logan Case, supra, the defendant recovered upon a cross-action. The Court of Civil Appeals reversed the judgment and dismissed the case because the whole transaction was illegal, thus holding that neither party was entitled to recover. Obviously, that should not be the order here.

Denman recovered upon the check, which was given in settlement of a gambling debt. No recovery was asked or decreed for Allen. We think the proper order should be in such case that the judgment be reversed and here rendered that Denman take nothing, which is, in legal effect, the same as that rendered in the Norris-Logan Case.

The motion for rehearing is overruled.